# M'Culloch v. The State of Maryland et al.

Congress has power to incorporate a Bank.

The government of the Union is a government of the People; it emanates from them; its powers are granted by them; and are to be exercised directly on them, and for their benefit.

The government of the Union, though limited in its powers, is su-preme within its sphere of action; and its laws, when made in pur-suance of the constitution, form the supreme law of the land.

There is nothing in the Constitution of the United States, similar to the articles of Confederation, which exclude incidental or implied powers.

If the *end* be legitimate, and within the scope of the constitution, all the *means* which are appropriate, which are plainly adapted to that end, and which are not prohibited, may constitutionally be em-ployed to carry it into effect.

The power of establishing a corporation is not a distinct sovereign power or end of government, but only the means of carrying into effect other powers which are sovereign. Whenever it becomes an appropriate means of exercising any of the powers given by the constitution to the government of the Union, it may be exercised by that government.

If a certain means to carry into effect any of the powers, expressly given by the constitution to the government of the Union, be an appropiate measure, not prohibited by the constitution, the degree of its necessity is a question of legislative discretion, not of judicial cognizance.

The act of the 10th April, 1816, c. 44., to "incorporate the subscri-bers to the Bank of the United States," is a law made in pursuance of the constitution.

The Bank of the United States has, constitutionally, a right to esta-blish its branches or offices of discount and deposit within any State.

The State, within which such branch may be established, cannot, without violating the constitution, tax that branch.

The State governments have no right to tax any of the constitutional means employed by the goverment of the Union to execute its con-stitutional powers.

The States have no power, by taxation, or otherwise, to retard, impede, burden, or in any manner controul the operations of the constitutional laws enacted by Congress, to carry into effect the powers vested in the national government.

This principle does not extend to a tax paid by the real property of the Bank of the United States, in common with the other real property in a particular State, nor to a tax imposed on the proprietary interest which the citizens of that State may hold in this institution, in common with other property of the same description throughout the State.

1819.

M'Culloch
v.
State of Maryland.

ERROR to the Court of Appeals of the State of Maryland.

This was an action of debt brought by the defendant in error, John James, who sued as well for himself as for the State of Maryland, in the County Court of Baltimore County, in the said State, against the plaintiff in error, M'Culloch, to recover certain penalties under the act of the legislature of Maryland, hereafter mentioned. Judgment being rendered against the plaintiff in error, upon the following statement of facts, agreed and submitted to the Court by the parties, was affirmed by the Court of Appeals of the State of Maryland, the highest Court of law of said State, and the cause was brought, by writ of error, to this Court.

It is admitted by the parties in this cause, by their counsel, that there was passed on the 10th day of April, 1816, by the Congress of the United States, an act, entitled, " an act to incorporate the subscribers to the Bank of the United States;" and that there was passed, on the 11th day of February, 1818, by the General Assembly of Maryland, an act, entitled, " an act to impose a tax on all Banks, or branches thereof, in the State of Maryland, *not chartered by the legis-*

*lature*," which said acts are made part of this state-
ment, and it is agreed may be read from the statute
books in which they are respectively printed. It is
further admitted, that the President, Directors and
Company of the Bank of the United States, incor-
porated by the act of Congress aforesaid, did organ-
ize themselves, and go into full operation in the City
of Philadelphia, in the State of Pennsylvania, in pur-
suance of the said act, and that they did on the
day of          eighteen hundred and seventeen, es-
tablish a branch of the said Bank, or an office of
discount and deposit in the city of Baltimore, in the
state of Maryland, which has from that time until
the first day of May, eighteen hundred and eighteen,
ever since transacted and carried on business as a Bank,
or office of discount and deposit, and as a branch of
the said Bank of the United States, by issuing Bank
notes and discounting promissory notes, and perform-
ing other operations usual and customary for Banks
to do and perform, under the authority and by the di-
rection of the said President, Directors and Company
of the Bank of the United Sates, established at Phila-
delphia as aforesaid. It is further admitted, that the
said President, Directors and Company of the said
Bank, had no authority to establish the said branch,
or office of discount and deposit at the city of Balti-
more, from the State of Maryland, otherwise than
the said State having adopted the Constitution of
the United States and composing one of the States
of the Union. It is further admitted, that James
William M'Culloch, the defendant below, being the
cashier of the said branch or office of discount and

deposit, did, on the several days set forth in the declaration in this cause, issue the said respective Bank notes therein described, from the said branch, or office, to a certain George Williams, in the city of Baltimore, in part payment of a promissory note of the said Williams, discounted by the said branch or office, which said respective Bank notes were not, nor was either of them, so issued on stamped paper in the manner prescribed by the act of Assembly aforesaid. It is further admitted, that the said President, Directors and Company of the Bank of the United States, and the said branch or office of discount and deposit have not, nor has either of them, paid in advance, or otherwise, the sum of fifteen thousand dollars, to the Treasurer of the Western shore, for the use of the State of Maryland, before the issuing of the said notes, or any of them, nor since those periods. And it is further admitted, that the Treasurer of the Western Shore of Maryland, under the direction of the Governor and Council of the said State, was ready, and offered to deliver to the said President, Directors and Company of the said Bank, and to the said branch, or office of discount and deposit, stamped paper of the kind and denomination required and described in the said act of Assembly.

The question submitted to the Court for their decision in this case, is as to the validity of the said act of the General Assembly of Maryland, on the ground of its being repugnant to the constitution of the United States, and the act of Congress aforesaid, or to one of them. Upon the foregoing statement of facts, and the pleadings in this cause, (all errors in.

which are hereby agreed to be mutually released,) if the Court should be of opinion that the plaintiffs are entitled to recover, then judgment it is agreed shall be entered for the plaintiffs for twenty-five hundred dollars, and costs of suit. But if the Court should be of opinion that the plaintiffs are not entitled to recover upon the statement and pleadings aforesaid, then judgment of *non pros* shall be entered, with costs to the defendant.

It is agreed that either party may appeal from the decision of the County Court, to the Court of Appeals, and from the decision of the Court of Appeals to the Supreme Court of the United States according to the modes and usages of law, and have the same benefit of this statement of facts, in the same manner as could be had if a jury had been sworn and empannelled in this cause, and a special verdict had been found, or these facts had appeared and been stated in an exception taken to the opinion of the Court, and the Court's direction to the jury thereon.

Copy of the Act of the Legislature of the State of Maryland, referred to in the preceding statement.

*An Act to impose a Tax on all Banks or Branches thereof in the State of Maryland, not chartered by the Legislature.*

*Be it enacted by the General Assembly of Maryland,* That if any Bank has established, or shall without authority from the State first had and obtained, establish any branch, office of discount and

deposit, or office of pay and receipt, in any part of this State, it shall not be lawful for the said branch, office of discount and deposit, or office of pay and receipt, to issue notes in any manner, of any other denomination than five, ten, twenty, fifty, one hundred, five hundred and one thousand dollars, and no note shall be issued except upon stamped paper of the following denominations; that is to say, every five dollar note shall be upon a stamp of ten cents; every ten dollar note upon a stamp of twenty cents; every twenty dollar note, upon a stamp of thirty cents; every fifty dollar note, upon a stamp of fifty cents; every one hundred dollar note, upon a stamp of one dollar; every five hundred dollar note, upon a stamp of ten dollars; and, every thousand dollar note, upon a stamp of twenty dollars; which paper shall be furnished by the Treasurer of the Western Shore, under the direction of the Governor and Council, to be paid for upon delivery; *Provided always*, That any institution of the above description may relieve itself from the operation of the provisions aforesaid, by paying annually, in advance, to the Treasurer of the Western Shore, for the use of the State, the sum of fifteen thousand dollars.

*And be it enacted*, That the President, Cashier, each of the Directors and Officers of every institution established, or to be established as aforesaid, offending against the provisions aforesaid, shall forfeit a sum of five hundred dollars for each and every offence, and every person having any agency in circulating any note aforesaid, not stamped as aforesaid directed, shall forfeit a sum not exceeding one hun-

*1819.*

M'Culloch
v.
State of Maryland.

dred dollars; every penalty aforesaid to be recovered by indictment, or action of debt, in the County Court of the county where the offence shall be committed, one half to the informer, and the other half to the use of the State.

*And be it enacted,* That this act shall be in full force and effect from and after the first day of May next.

*Feb. 22d—27th, and March 1st—3d.*

Mr. *Webster,* for the plaintiff in error,[a] 1. stated, that the question whether Congress constitutionally possesses the power to incorporate a bank, might be raised upon this record; and it was in the discretion of the defendant's counsel to agitate it. But it might have been hoped that it was not now to be considered as an open question. It is a question of the utmost magnitude, deeply interesting to the government itself, as well as to individuals. The mere discussion of such a question may most essentially affect the value of a vast amount of private property. We are bound to suppose that the defendant in error is well aware of these consequences, and would not have intimated an intention to agitate such a question, but with a real design to make it a topic of serious discussion, and with a view of demanding upon it the solemn judgment of this Court. This

a. This case involving a constitutional question of great public importance, and the sovereign rights of the United States and the State of Maryland; and the government of the United States having directed their Attorney General to appear for the plaintiff in error, the Court dispensed with its general rule, permitting only two counsel to argue for each party.

question arose early after the adoption of the consti-tution, and was discussed, and settled, as far as legis-lative decision could settle it, in the first Congress. The arguments drawn from the constitution in fa-vour of this power, were stated, and exhausted, in that discussion. They were exhibited, with charac-teristic perspicuity and force, by the first Secretary of the Treasury, in his report to the President of the United States. The first Congress created and incorporated a bank.[a] Nearly each succeeding Con-gress, if not every one, has acted and legislated on the presumption of the legal existence of such a power in the government. Individuals, it is true, have doubted, or thought otherwise ; but it cannot be shown that either branch of the legislature has, at any time, expressed an opinion against the existence of the power. The executive government has acted upon it ; and the courts of law have acted upon it. Many of those who doubted or denied the existence of the power, when first attempted to be exercised, have yielded to the first decision, and acquiesced in it, as a settled question. When all branches of the government have thus been acting on the existence of this power nearly thirty years, it would seem almost too late to call it in question, unless its re-pugnancy with the constitution were plain and mani-fest. Congress, by the constitution, is invested with certain powers ; and, as to the objects, and within the scope of these powers, it is sovereign. Even without the aid of the general clause in the constitu-

1819.

M·Culloch
v.
State of Ma-
ryland.

a Act of February 5th, 1791, c. 84.

tion, empowering Congress to pass all necessary and proper laws for carrying its powers into execution, the grant of powers itself necessarily implies the grant of all usual and suitable means for the execution of the powers granted. Congress may declare war; it may consequently carry on war, by armies and navies, and other suitable means and methods of warfare. So it has power to raise a revenue, and to apply it in the support of the government, and defence of the country. It may, of course, use all proper and suitable means, not specially prohibited, in the raising and disbursement of the revenue. And if, in the progress of society and the arts, new means arise, either of carrying on war, or of raising revenue, these new means doubtless would be properly considered as within the grant. Steam frigates, for example, were not in the minds of those who framed the constitution, as among the means of naval warfare; but no one doubts the power of Congress to use them, as means to an authorized end. It is not enough to say, that it does not appear that a bank was in the contemplation of the framers of the constitution. It was not their intention, in these cases, to enumerate particulars. The true view of the subject is, that if it be a fit instrument to an authorized purpose, it may be used, not being specially prohibited. Congress is authorized to pass all laws " necessary and proper" to carry into execution the powers conferred on it. These words, " necessary and proper," in such an instrument, are probably to be considered as synonimous. *Necessary* powers must here intend such powers as are *suitable* and

*fitted* to the object; such as are *best* and *most useful*
in relation to the end proposed. If this be not so,
and if Congress could use no means but such as were
*absolutely indispensable* to the existence of a granted
power, the government would hardly exist; at least,
it would be wholly inadequate to the purposes of its
formation. A bank is a proper and suitable instru-
ment to assist the operations of the government, in
the collection and disbursement of the revenue; in
the occasional anticipations of taxes and imposts;
and in the regulation of the actual currency, as be-
ing a part of the trade and exchange between the
States. It is not for this Court to decide whether *a*
*bank*, or *such a bank* as this, be the *best* possible
means to aid these purposes of government. Such
topics must be left to that discussion which belongs
to them in the two houses of Congress. Here, the
only question is, whether a bank, in its known and
ordinary operations, is capable of being so connected
with the finances and revenues of the government,
as to be fairly within the discretion of Congress,
when selecting means and instruments to execute its
powers and perform its duties. A bank is not less
the proper subject for the choice of Congress, nor
the less constitutional, because it requires to be exe-
cuted by granting a charter of incorporation. It is
not, of itself, unconstitutional in Congress to create
a corporation. Corporations are but means. They
are not ends and objects of government. No govern-
ment exists for the purpose of creating corporations
as one of the ends of its being. They are institu-
tions established to effect certain beneficial purposes;

1819.

M'Culloch
v.
State of Ma-
ryland.

and, as means, take their character generally from their end and object. They are civil or eleemosynary, public or private, according to the object intended by their creation. They are common means, such as all governments use. The State governments create corporations to execute powers confided to their trust, without any specific authority in the State constitutions for that purpose. There is the same reason that Congress should exercise its discretion as to the means by which it must execute the powers conferred upon it. Congress has duties to perform and powers to execute. It has a right to the means by which these duties can be properly and most usefully performed, and these powers executed. Among other means, it has established a bank; and before the act establishing it can be pronounced unconstitutional and void, it must be shown, that a bank has no fair connection with the execution of any power or duty of the national government, and that its creation is consequently a manifest usurpation.

2. The second question is, whether, if the bank be constitutionally created, the State governments have power to tax it? The people of the United States have seen fit to divide sovereignty, and to establish a complex system. They have conferred certain powers on the State Governments, and certain other powers on the National Government. As it was easy to foresee that questions must arise between these governments thus constituted, it became of great moment to determine upon what principle these questions should be decided, and who should decide them. The constitution, therefore, declares, that the

constitution itself, and the laws passed in pursuance of its provisions, shall be the *supreme law of the land*, and shall control all State legislation and State constitutions, which may be incompatible therewith; and it confides to this Court the ultimate power of deciding all questions arising under the constitution and laws of the United States. The laws of the United States, then, made in pursuance of the constitution, are to be the supreme law of the land, any thing in the laws of any State to the contrary notwithstanding. The only inquiry, therefore, in this case is, whether the law of the State of Maryland imposing this tax be consistent with the free operation of the law establishing the bank, and the full enjoyment of the privileges conferred by it? If it be not, then it is void; if it be, then it may be valid. Upon the supposition that the bank is constitutionally created, this is the only question; and this question seems answered as soon as it is stated. If the States may tax the bank, to what extent shall they tax it, and where shall they stop? An unlimited power to tax involves, necessarily, a power to destroy; because there is a limit beyond which no institution and no property can bear taxation. A question of constitutional power can hardly be made to depend on a question of more or less. If the States may tax, they have no limit but their discretion; and the bank, therefore, must depend on the *discretion* of the State governments for its existence. This consequence is inevitable. The object in laying this tax, may have been *revenue* to the State. In the next case, the object may be to *expel the bank from the State;* but

1819.

M'Culloch
v.
State of Maryland.

1819.

M'Culloch
v.
State of Ma-
ryland.

how is this object to be ascertained, or who is to judge of the motives of legislative acts? The government of the United States has itself a great pecuniary interest in this corporation. Can the States tax this property? Under the Confederation, when the national government, not having the power of direct legislation, could not protect its own property by its own laws, it was expressly stipulated, that "no impositions, duties, or restrictions, should be laid by any State on the property of the United States." Is it supposed that property of the United States is now subject to the power of the State governments, in a greater degree than under the Confederation? If this power of taxation be admitted, what is to be its limit? The United States have, and must have, property locally existing in all the States; and may the States impose on this property, whether real or personal, such taxes as they please? Can they tax proceedings in the Federal Courts? If so, they can expel those judicatures from the States. As Maryland has undertaken to impose a stamp tax on the notes of this bank, what hinders her from imposing a stamp tax also on permits, clearances, registers, and all other documents connected with imposts and navigation? If by one she can suspend the operations of the bank, by the other she can equally well shut up the custom house. The law of Maryland, in question, makes a *requisition.* The sum called for is not assessed on property, nor deducted from profits or income. It is a direct imposition on the power, privilege, or franchise of the corporation. The act purports, also, to re-

strain the circulation of the paper of the bank to bills of certain descriptions. It narrows and abridges the powers of the bank in a manner which, it would seem, even Congress could not do. This law of Maryland cannot be sustained but upon principles and reasoning which would subject every important measure of the national government to the revision and control of the State legislatures. By the charter, the bank is authorized to issue bills of any denomination above five dollars. The act of Maryland purports *to restrain and limit their powers in this respect.* The charter, as well as the laws of the United States, makes it the duty of all collectors and receivers to receive the notes of the bank in payment of all debts due the government. The act of Maryland *makes it penal,* both on the person paying and the person receiving such bills, *until stamped by the authority of Maryland.* This is a direct interference with the revenue. The legislature of Maryland might, with as much propriety, tax treasury notes. This is either an attempt to expel the bank from the State; or it is an attempt to raise a revenue for State purposes, by an imposition on property and franchises holden under the national government, and created by that government for purposes connected with its own administration. In either view there cannot be a clearer case of interference. The bank cannot exist, nor can any bank established by Congress exist, if this right to tax it exists in the State governments. One or the other must be surrendered; and a surrender on the part of the government of the United States would be a giving

up of those fundamental and essential powers with-
out which the government cannot be maintained.
A bank may not be, and is not, absolutely essential
to the existence and preservation of the government.
But it is essential to the existence and preservation
of the government, that Congress should be able to
exercise its constitutional powers, at its own discre-
tion, without being subject to the control of State
legislation. The question is not whether a bank be
necessary, or useful, but whether Congress may not
constitutionally judge of that necessity or utility;
and whether, having so judged and decided, and
having adopted measures to carry its decision into
effect, the State governments may interfere with that
decision, and defeat the operation of its measures.
Nothing can be plainer than that, if the law of Con-
gress establishing the bank be a constitutional act,
it must have its full and complete effects. Its ope-
ration cannot be either defeated or impeded by acts
of State legislation. To hold otherwise, would be
to declare, that Congress can only exercise its con-
stitutional powers subject to the controlling discre-
tion, and under the sufferance, of the State govern-
ments.

Mr. *Hopkinson*, for the defendants in error, pro-
posed three questions for the consideration of the
Court. 1. Had Congress a constitutional power to
incorporate the bank of the United States? 2. Grant-
ing this power to Congress, has the bank, of its own
authority, a right to establish its branches in the se-
veral States? 3. Can the bank, and its branches
thus established, claim to be exempt from the ordi-

nary and equal taxation of property, as assessed in the States in which they are placed?

1. The first question has, for many years, divided the opinions of the first men of our country. He did not mean to controvert the arguments by which the bank was maintained on its original establishment. The power may now be denied, in perfect consistency with those arguments. It is agreed, that no such power is expressly granted by the constitution. It has been obtained by implication; by reasoning from the 8th section of the 1st article of the constitution; and asserted to exist, not of and by itself, but as an appendage to other granted powers, as necessary to carry them into execution. If the bank be not " *necessary and proper*" for this purpose, it has no foundation in our constitution, and can have no support in this Court. But it strikes us at once, that a power, growing out of a necessity which may not be permanent, may also not be permanent. It has relation to circumstances which change; in a state of things which may exist at one period, and not at another. The argument might have been perfectly good, to show the necessity of a bank for the operations of the revenue, in 1791, and entirely fail now, when so many facilities for money transactions abound, which were wanting then. That some of the powers of the constitution are of this fluctuating character, existing, or not, according to extraneous circumstances, has been fully recognized by this Court at the present term, in the case of Sturges v. Crowninshield.[a] Necessity was the plea and justification

*a Ante*, p. 122.

of the first bank of the United States. If the same
necessity existed when the second was established,
it will afford the same justification; otherwise, it will
stand without justification, as no other is pretended.
We cannot, in making this inquiry, take a more fair
and liberal test, than the report of General Hamilton,
the father and defender of this power. The uses and
advantages he states, as making up the necessity re-
quired by the constitution, are three. 1. The augmen-
tation of the active and productive capital of the
country; by making gold and silver the basis of a
paper circulation. 2. Affording greater facility to
the government, in procuring pecuniary aids; espe-
cially in sudden emergencies. This, he says, is an
indisputable advantage of *public banks.* 3. The fa-
cility of the payment of taxes, in two ways; by loan-
ing to the citizen, and enabling him to be punctual;
and by increasing the quantity of circulating medium,
and quickening circulation by bank bills, easily trans-
mitted from place to place. If we admit, that these
advantages, or conveniences, amount to the necessity
required by the constitution, for the creation and ex-
ercise of powers not expressly given; yet it is obvi-
ous they may be derived from any *public banks,* and
do not call for a bank of the United States, unless
there should be no other public banks, or not a suffi-
ciency of them for these operations. In 1791, when
this argument was held to be valid and effectual,
there were but three banks in the United States,
with limited capitals, and contracted spheres of ope-
ration. Very different is the case now, when we
have a banking capital to a vast amount, vested in

1819.

M'Culloch
v.
State of Ma
ryland.

banks of good credit, and so spread over the country, as to be convenient and competent for all the purposes enumerated in the argument. General Hamilton, conscious that his reasoning must fail, if the State banks were adequate for his objects, proceeds to show they were not. Mr. *Hopkinson* particularly examined all the objections urged by General Hamilton, to the agency of the State banks then in existence, in the operations required for the revenue; and endeavoured to show, that they had no application to the present number, extent, and situation of the State banks; relying only on those of a sound and unquestioned credit and permanency. He also contended, that the experience of five years, since the expiration of the old charter of the bank of the United States, has fully shown the competency of the State banks, to all the purposes and uses alleged as reasons for erecting that bank, in 1791. The loans to the government by the State banks, in the emergencies spoken of; the accommodation to individuals, to enable them to pay their duties and taxes; the creation of a circulating currency; and the facility of transmitting money from place to place, have all been effected, as largely and beneficially, by the State banks, as they could have been done by a bank incorporated by Congress. The change in the country, in relation to banks, and an experience that was depended upon, concur in proving, that whatever might have been the truth and force of the bank argument in 1791, they were wholly wanting in 1816.

2. If this bank of the United States has been lawful-ly created and incorporated, we next inquire, whether it may, of its own authority, establish its branches in the several States, without the direction of Con-gress, or the assent of the States. It is true, that the charter contains this power, but this avails nothing, if not warranted by the constitution. This power to establish branches, by the directors of the bank, must be maintained and justified, by the same neces-sity which supports the bank itself, or it cannot exist. The power derived from a given necessity, must be co-extensive with it, and no more. We will inquire, 1. Does this necessity exist in favour of the branches? 2. Who should be the judge of the necessity, and direct the manner and extent of the remedy to be ap-plied? Branches are not necessary for any of the enu-merated advantages. Not for pecuniary aids to the government; since the ability to afford them must be regulated by the strength of the capital of the parent bank, and cannot be increased, by scattering and spreading that capital in the branches. Nor are they necessary to create a circulating medium; for they create nothing; but issue paper on the faith and re-sponsibility of the parent bank, who could issue the same quantity on the same foundation; the distribu-tion of the notes of the parent bank can as well be done, and, in fact, is done, by the State banks. Where, then, is that necessity to be found for the branches, whatever may be allowed to the bank it-self? It is undoubtedly true, that these branches are established with a single view to trading, and the pro-fit of the stockholders, and not for the convenience

or use of the government; and, therefore, they are located at the will of the directors, who represent and regard the interests of the stockholders, and are such themselves. If this is the case, can it be contended, that the State rights of territory and taxation are to yield for the gains of a money-trading corporation; to be prostrated at the will of a set of men who have no concern, and no duty, but to increase their profits? Is this the necessity required by the constitution for the creation of undefined powers? It is true, that, by the charter, the government may require a branch in any place it may designate, but if this power is given *only* for the uses or necessities of the government, then the government *only* should have the power to order it. In truth, the directors have exercised the power, and they hold it without any control from the government of the United States; and, as is now contended, without any control of the State governments. A most extravagant power to be vested in a body of men, chosen annually by a very small portion of our citizens, for the purpose of loaning and trading with their money to the best advantage! A State will not suffer its own citizens to erect a bank without its authority, but the citizens of another State may do so; for it may happen that the State thus used by the bank for one of its branches, does not hold a single share of the stock. 2. But if these branches are to be supported, on the ground of the constitutional necessity, and they can have no other foundation, the question occurs, who should be the judge of the existence of the necessity, in any proposed case; of the *when* and the *where* the power

1819.

M'Culloch
v.
State of Ma-
ryland.

shall be exercised, which the necessity requires. As-suredly, the same tribunal which judges of the original necessity on which the bank is created, should also judge of any subsequent necessity requiring the ex-tension of the remedy.  Congress is that tribunal; the only one in which it may be safely trusted; the only one in which the States to be affected by the measure, are all fairly represented.  If this power belongs to Congress, it cannot be delegated to the directors of a bank, any more than any other legis-lative power may be transferred to any other body of citizens: if this doctrine of necessity is without any known limits, but such as those who defend themselves by it, may choose for the time to give it; and if the powers derived from it, are assignable by the Congress to the directors of a bank; and by the directors of the bank to any body else ; we have really spent a great deal of labour and learning to very little purpose, in our attempt to establish a form of government in which the powers of those who govern shall be strictly defined and controlled ; and the rights of the government secured from the usur-pations of unlimited or unknown powers.  The esta-blishment of a bank in a State, without its assent; without regard to its interests, its policy, or institu-tions, is a higher exercise of authority, than the crea-tion of the parent bank ; which, if confined to the seat of the government, and to the purposes of the government, will interfere less with the rights and policy of the States, than those wide spreading branches, planted every where, and influencing all the business of the community.  Such an exercise of

sovereign power, should, at least, have the sanction of the sovereign legislature to vouch that the good of the whole requires it, that the necessity exists which justifies it. But will it be tolerated, that twenty directors of a trading corporation, having no object but profit, shall, in the pursuit of it, tread upon the sovereignty of the State; enter it without condescending to ask its leave; disregard, perhaps, the whole system of its policy; overthrow its institutions, and sacrifice its interests?

3. If, however, the States of this Union have surrendered themselves in this manner, by implication, to the Congress of the United States, and to such corporations as the Congress, from time to time, may find it "necessary and proper" to create; if a State may no longer decide, whether a trading association, with independent powers and immunities, shall plant itself in its territory, carry on its business, make a currency and trade on its credit, raising capitals for individuals as fictitious as its own; if all this must be granted, the third and great question in this cause presents itself for consideration; that is, shall this association come there with rights of sovereignty, paramount to the sovereignty of the State, and with privileges possessed by no other *persons, corporations* or *property* in the State? in other words, can the bank and its branches, thus established, claim to be exempt from the ordinary and equal taxation of property, as assessed in the States in which they are placed? As this overwhelming invasion of State sovereignty is not warranted by any express clause or grant in the constitution, and never was

imagined by any State that adopted and ratified that constitution, it will be conceded, that it must be found to be *necessarily and indissolubly* connected with the power to establish the bank, or it must be repelled. The Court has always shown a just anxiety to prevent any conflict between the federal and State powers; to construe both so as to avoid an interference if possible, and to preserve that harmony of action in both, on which the prosperity and happiness of all depend. If, therefore, the right to incorporate a national bank may exist, and be exercised consistently with the right of the State, to tax the property of such bank within its territory, the Court will maintain both rights; although some inconvenience or diminution of advantage may be the consequence. It is not for the directors of the bank to say, you will lessen our profits by permitting us to be taxed; if such taxation will not deprive the government of the uses it derives from the agency and operations of the bank. The necessity of the government is the foundation of the charter; and beyond that necessity it can claim nothing in deroga-tion of State authority. If the power to erect this corporation were expressly given in the constitution, still it would not be construed to be an exclusion of *any* State right, not absolutely incompatible and re-pugnant. The States need no reservation or ac-knowledgment of their right; all remain that are not *expressly prohibited*, or *necessarily* excluded; and this gives our opponents the broadest ground they can ask. The right now assailed by the bank, is the right of taxing property within the territory of

the State. This is the highest attribute of sove-riegnty, the right to raise revenue ; in fact, the right to exist ; without which no other right can be held or enjoyed. The general power to tax is not denied to the States, but the bank claims to be exempted from the operation of this power. If this claim is valid, and to be supported by the Court, it must be, either, 1. From the nature of the property. 2. Be-cause it is a bank of the United States. 3. From some express provision of the constitution; or, 4, Because the exemption is indispensably necessary to the exercise of some power granted by the constitu-tion.

*First.* There is nothing in the nature of the pro-perty of bank stock that exonerates it from taxa-tion. It has been taxed, in some form, by every State in which a bank has been incorporated ; either annually and directly, or by a gross sum paid for the charter. The United States have not only taxed the capital or stock of the State banks, but their busi-ness also, by imposing a duty on all notes discounted by them. The bank paid a tax for its capital ; and every man who deals with the bank, by borrowing, paid another tax for the portion of the same capital he borrowed. This species of property, then, so far from having enjoyed any exemption from the calls of the revenue, has been particularly burthened ; and been thought a fair subject of taxation both by the Federal and State governments.

*Second.* Is it then exempt, as being a bank of the United States ? How is it such ? In name only. Just as the Bank of Pennsylvania, or the Bank of Mary-

1819.

M‘Culloch
v.
State of Ma-
ryland.

land, are banks of those States. The property of the bank, real or personal, does not belong to the United States only as a stockholder, and as any other stockholders. The United States might have the same interest in any other bank, turnpike, or canal company. So far as they hold stock, they have a property in the institution, and no further ; so long and no longer. Nor is the direction and management of the bank under the control of the United States. They are represented in the board by the directors appointed by them, as the other stockholders are represented by the directors they elect. A director of the government has no more power or right than any other director. As to the control the government may have over the conduct of the bank, by its patronage and deposits, it is precisely the same it might have over any other bank, to which that patronage would be equally important. Strip it of its name, and we find it to be a mere association of individuals, putting their money into a common stock, to be loaned for profit, and to divide the gains. The government is a partner in the firm, for gain also ; for, except a participation of the profits of the business, the government could have every other use of the bank without owning a dollar in it. It is not, then, a bank of the United States, if by that we mean an institution belonging to the government, directed by it, or in which it has a permanent, indissoluble interest. The convenience it affords in the collection and distribution of the revenue, is collateral, secondary, and may be transferred at pleasure to any other bank. It forms no part of the construc-

tion or character of this bank; which, as to all its rights and powers, would be exactly what it now is if the government was to seek and obtain all this convenience from some other source; if the government were to withdraw its patronage, and sell out its stock. How, then, can such an institution claim the immunities of sovereignty; nay, that sovereignty does not possess? for a sovereign, who places his property in the territory of another sovereign, submits it to the demands of the revenue, which are but justly paid, in return for the protection afforded to the property.    General Hamilton, in his report on this subject, so far from considering the bank a public institution, connected with, or controlled by the government, holds it to be indispensable that it should not be so.    It must be, says he, under *private*, not public, direction; under the guidance of *individual interest*, not *public policy*. Still, he adds, the state may be holder of part of its stock; and, consequently, (what! it becomes public property? no!) a *sharer of the profits.*  He traces no other consequence to that circumstance." No rights are founded on it; no part of its utility or necessity arises from it.    Can an institution, then, purely private, and which disclaims any public character, be clothed with the power and rights of the government, and demand subordination from the State government, in virtue of the federal authority, which it undertakes to wield at its own will and pleasure? Shall it be private in its direction and interests; public in its rights and privileges: a trading money-lender in its business; an uncontrolled sovereign in its powers? If the whole bank, with all its property and business,

belonged to the United States, it would not, there-
fore, be exempted from the taxation of the States.
To this purpose, the United States and the several
States must be considered as sovereign and indepen-
dent; and the principle is clear, that a sovereign put-
ting his property within the territory and jurisdiction
of another sovereign, and of course under his protec-
tion, submits it to the ordinary taxation of the State,
and must contribute fairly to the wants of the reve-
nue.    In other words, the jurisdiction of the State
extends over all its territory, and every thing within
or upon it, with a few known exceptions.    With a
view to this principle, the constitution has provided
for those cases in which it was deemed necessary and
proper to give the United States jurisdiction within a
State, in exclusion of the State authority ; and even
in these cases, it will be seen, it cannot be done with-
out the assent of the State.    For a seat of govern-
ment, for forts, arsenals, dock-yards, &c. the assent
of the State to surrender its jurisdiction is required ;
but the bank asks no consent, and is paramount to
all State authority, to all the rights of territory, and
demands of the public revenue.    We have not been
told, whether the banking houses of this corporation,
and any other real estate it may acquire, for the ac-
commodation of its affairs, are, also, of this privileged
order of property.    In principle, it must be the same;
for the privilege, if it exists, belongs to the corpora-
tion, and must cover equally all its property.    It is
understood, that a case was lately decided by the Su-
preme Court of Pennsylvania, and from which no
appeal has been taken, on the part of the United

States to this Court, to show that United States' pro-
perty, as such, has no exemption from State taxa-
tion. A fort, belonging to the federal government,
near Pittsburgh, was sold by public auction; the usual
auction duty was claimed, and the payment resisted,
on the ground that none could be exacted from the
United States. The Court decided otherwise. In
admitting Louisiana into the Union, and so, it is be-
lieved, with all the new States, it is expressly stipu-
lated, "that no taxes shall be imposed on lands, the
property of the United States." There can, then, be
no pretence, that bank property, even belonging to
the United States, is, on that account, exonerated
from State taxation.

*Third.* If, then, neither the nature of the property,
nor the interest the United States may have in the
bank, will warrant the exemption claimed, is there
any thing expressed in the constitution to limit and
control the State right of taxation, as now contended
for? We find but one limitation to this essential right,
of which the States were naturally and justly most
jealous. In the 10th section of the 1st article, it is
declared, that "no State shall, without the con-
sent of Congress, lay any imposts or duties, on im-
ports or exports, except what may be absolutely ne-
cessary for executing its inspection laws." And
there is a like prohibition to laying any duty of ton-
nage. Here, then, is the whole restriction, or limi-
tation, attempted to be imposed by the constitution,
on the power of the States to raise revenue, precise-
ly in the same manner, from the same subjects, and
to the same extent, that any sovereign and indepen-

dent State may do; and it never was understood by those who made, or those who received the constitution, that any further restriction ever would, or could, be imposed. This subject did not escape either the assailants or the defenders of our form of government; and their arguments and commentaries upon the instrument ought not to be disregarded in fixing its construction. It was foreseen, and objected, by its opponents, that, under the general sweeping power given to Congress, "To make all laws which shall be necessary and proper, for carrying into execution the foregoing powers," &c. the States might be exposed to great dangers, and the most humiliating and oppressive encroachments, particularly in this very matter of taxation. By referring to the *Federalist*, the great champion of the constitution, the objections will be found stated, together with the answers to them. It is again and again replied, and most solemnly asserted, to the people of these United States, that the right of taxation in the States is sacred and inviolable, with " the sole exception of duties on imports and exports;" that " they retain the authority in the most absolute and unqualified sense; and that an attempt on the part of the national government to abridge them in the exercise of it, would be a violent assumption of power, unwarranted by any article or clause of its constitution." With the exception mentioned, the Federal and State powers of taxation are declared to be *concurrent;* and if the United States are justified in taxing State banks, the same equal and concurrent authority will justify the State in taxing the Bank of the United States, or any

other bank."[a] The author begins, No. 34, by saying, "I flatter myself it has been clearly shown, in my last number, that the particular States, under the proposed constitution, would have CO EQUAL authority with the Union, in the article of revenue, except as to duties on imports." Under such assurances from those who made, who recommended, and carried, the constitution, and who were supposed best to understand it, was it received and adopted by the people of these Uni ed States; and now, after a lapse of nearly thirty years, they are to be informed that all this is a mistake, all these assurances are unwarranted, and that the Federal Government does possess most productive and important powers of taxation, neither on imports, exports, or tonnage, but strictly *internal*, which are prohibited to the States. The question then was, whether the United States should have any command of the internal revenue; the pretension now is, that they shall enjoy exclusively the best portion of it. The question was then quieted by the acknowledgment of a co-equal right; it is now to be put at rest by the prostration of the State power. The Federal Government is to hold a power by implication and ingenious inference from general words in the constitution, which it can hardly be believed would have been suffered in an express grant. If, then, the people were not deceived when they were told that, with the exceptions mentioned, the State right of taxation is sacred and inviolable; and it be also true

1819.

M'Culloch
v
State of Maryland.

a *Letters of Publius, or The Federalist,* Nos. 31—36.

that the Bank of the United States cannot exist under the exercise of that right, the consequence ought to be, that the Bank must not exist; for if it can live only by the destruction of such a right—if it can live only by the exercise of a power which this Court solemnly declared to be a "violent assumption of power, unwarranted by any clause in the constitution"—we cannot hesitate to say, let it not live. But in truth this is not the state of the controversy. No such extremes are presented for our choice. We only require, that the bank shall not violate State rights, in establishing itself, or its branches; that it shall be submitted to the jurisdiction and laws of the State, in the same manner with other corporations and other property; and all this may be done without ruining the institution, or destroying its national uses. Its profits will be diminished by contributing to the revenue of the State; and this is the whole effect that ought, in a fair and liberal spirit of reasoning, to be anticipated. But, at all events, we show, on the part of the State, a clear, general, absolute, and unqualified right of taxation, (with the exception stated;) and protest against such a right being made to yield to implications and obscure constructions of indefinite clauses in the constitution. Such a right must not be defeated by doubtful pretensions of power, or arguments of convenience or policy to the government; much less to a private corporation. It is not a little alarming to trace the progress of this argument. . . The power to raise the bank is founded on no provision of the constitution that has the most distant allusion to such an

institution; there is not a word in that instrument
that would suggest the idea of a bank to the most
fertile imagination; but the bank is created by im-
plication and construction, made out by a very subtle
course of reasoning; then, by another implication,
raised on the former, the bank, this creature of con-
struction, claims the right to enter the territory, of a
State without its assent; to carry on its business
when it pleases, and where it pleases, against the
will, and perhaps in contravention of the policy, of
the sovereign owner of the soil.   Having such great
success in the acquirement of implied rights, the ex-
periment is now pushed further; and not contented
with having obtained two rights in this extraordinary
way, the fortunate adventurer assails the sovereignty
of the State, and would strip from it its most vital and
essential power.   It is thus with the famous fig tree
of India, whose branches shoot from the trunk to a
considerable distance; then drop upon the earth,
where they take root and become trees, from which
also other branches shoot, and plant and propagate
and extend themselves in the same way, until gra-
dually a vast surface is covered, and every thing pe-
rishes in the spreading shade.

What have we opposed to these doctrines, so
just and reasonable?  Distressing inconveniences
ingeniously contrived; supposed dangers; fearful
distrusts; anticipated violence and injustice from
the States, and consequent ruin to the bank.   A
right to tax is a right to destroy, is the whole
amount of the argument, however varied by inge-
nuity, or embellished by eloquence   It is said the
States will abuse the power; and its exercise will

produce infinite inconvenience and embarrassment to the bank. Now if this were true, it cannot help our opponents; because if the States have the power contended for, this Court cannot take it from them, under the fear that they may abuse it; nor indeed for its actual abuse; and if they have it not, they may not use it, however moderately and discreetly. Nor is there any more force in the argument, that the bank property will be subjected to double or treble taxation. Each State will tax only the capital really employed in it; and it is always in the power of the bank to show how its capital is distributed. But it is feared the capital in a State may be taxed in gross; and the individual stockholders also taxed for the same stock. Is this common case of a double taxation of the same article, to be a cause of alarm now? Our revenue laws abound with similar cases; they arise out of the very nature of our double government. So says the *Federalist*; and it is the first time it has been the ground of complaint. Poll taxes are paid to the federal and State governments; licenses to retail spirits; land taxes; and the whole round of internal duties, over which both governments have a concurrent, and, until now, it was supposed, a co-equal right. Were not the State banks taxed by the federal, and also by the State governments; in some by a bonus for the charter; in others directly and annually? The circumstance, that the taxes go to different governments in these cases, is wholly immaterial to those who pay; unless it is that it increases the danger of excess and oppression. It is justly remarked on this subject, by

1819.

M‘Culloch
v.
State of Ma-
ryland.

the *Federalist*, that our security from excessive bur- thens on any source of revenue, must be found in mutual forbearance and discretion in the use of the power; this is the only security, and the authority of this Court can add nothing to it. When that fails, there is an end to the confederation, which is founded on a reasonable and honourable confidence in each other. It has been most impressively advanced, that the States, under pretence of taxing, may prohibit and expel the banks; that in the full exercise of this power, they may tax munitions of war; ships about to sail and armies on their march; nay, the spirit of the Court is to be aroused by the fear that judicial proceedings will also come under this all destroying power. Loans may be delayed for stamps, and the country ruined for the want of the money. But whenever the States shall be in a disposition to up- root the general government, they will take more direct and speedy means; and until they have this disposition, they will not use these. What power may not be abused; and whom or what shall we trust, if we guard ourselves with this extreme cau- tion? The common and daily intercourse between man and man; all our relations in society, depend upon a reasonable confidence in each other. It is peculiarly the basis of our confederation, which lives not a moment after we shall cease to trust each other. If the two governments are to regard each other as enemies, seeking opportunities of injury and distress, they will not long continue friends. This sort of timid reasoning about the powers of the go- vernment, has not escaped the authors so often al-

1819.

M'Culloch
v.
State of Maryland.

luded to; who, in their 31st number, treat it very properly. Surely the argument is as strong against giving to the United States the power to incorporate a bank with branches. What may be more easily, or more extensively abused; and what more powerful engine can we imagine to be brought into operation against the revenues and rights of the States? If the federal government must have a bank for the purposes of its revenue, all collision will be avoided by establishing the parent bank in its own District, where it holds an exclusive jurisdiction; and planting its branches in such States as shall assent to it; and using State banks where such assent cannot be obtained. Speaking practically, and by our experience, it may be safely asserted, that all the uses of the bank to the government might be thus obtained. Nothing would be wanting but profits and large dividends to the stockholders, which are the real object in this contest. Whatever may be the right of the United States to establish a bank, it cannot be better than that of the States. Their lawful power to incorporate such institutions, has never yet been questioned; whatever may be in reserve for them, when it may be found " necessary and proper", for the interests of the national bank to crush the State institutions, and curtail the State authority. Granting, that these rights are equal in the two governments; and that the sovereignty of the State, within its territory, over this subject, is but equal to that of the United States; and that all sovereign power remains undiminished in the States, except in those cases in which it has, by the constitution, been

expressly and exclusively transferred to the United
States: the sovereign power of taxation (except on
foreign commerce) being, in the language of the
Federalist, *co-equal* in the two governments; it fol-
lows, as a direct and necessary consequence, that
having equal powers to erect banks, and equal pow-
ers of taxation on property of that description, being
neither imports, exports or tonnage, whatever juris-
diction the federal government may exercise in this
respect, over a bank created by a State, any State
may exercise over a bank created by the United
States.   Now, the federal government has assumed
the right of taxing the State banks, precisely in the
manner in which the State of Maryland has pro-
ceeded against the bank of the United States; and
as this right has never been resisted or questioned, it
may be taken to be admitted by both parties; and
must be equal and common to both parties, or the
fundamental principles of our confederation have
been strangely mistaken, or are to be violently over-
thrown.  It has also been suggested that the bank
may claim a protection from this tax, under that
clause of the constitution, which prohibits the States
from passing laws, which shall impair the obliga-
tion of contracts.   The charter is said to be the con-
tract between the government and the stockholders;
and the interests of the latter will be injured by the
tax which reduces their profits.   Many answers offer
themselves to this argument.   In the first place, the
United States cannot, either by a direct law, or by a
contract with a third party, taken away any right
from the States not granted by the constitution; they

cannot do collaterally and by implication, what cannot be done directly. Their contracts must conform to the constitution, and not the constitution to their contracts. If, therefore, the States have, in some other way, parted with this right of taxation, they cannot be deprived of it by a contract between other parties. Under this doctrine, the United States might contract away every right of every State; and any attempt to resist it would be called a violation of the obligations of a contract. Again; the United States have no more right to violate contracts than the States, and surely they never imagined they were doing so, when they taxed so liberally the stock of the State banks. Again; it might as well be said that a tax on real estate, imposed after a sale of it, and not then perhaps contemplated, or new duties imposed on merchandize after it is ordered, violates the contract between the vendor and the purchaser, and diminishes the value of the property. In fact, all contracts in relation to property, subject to taxation, are presumed to have in view the probability or possibility that they will be taxed; and the happening of the event never was imagined to interfere with the contract, or its lawful obligations.

The *Attorney-General*, for the plaintiff in error, argued, 1. That the power of Congress to create a bank ought not now to be questioned, after its exercise ever since the establishment of the constitution, sanctioned by every department of the government: by the legislature, in the charter of the bank, and other laws connected with the incorporation; by the

executive, in its assent to those laws ; and by the judiciary, in carrying them into effect. After such a lapse of time, and so many concurrent acts of the public authorities, this exercise of power must be considered as ratified by the voice of the people, and sanctioned by precedent. In the exercise of criminal judicature, the question of constitutionality could not have been overlooked by the Courts, who have so often inflicted punishment for acts which would be no crimes, if these laws were repugnant to the fundamental law.

2. The power to establish such a corporation is implied, and involved in the grant of specific powers in the constitution ; because the end involves the means necessary to carry it into effect. A power without the means to use it, is a nullity. But we are not driven to seek for this power in implication : because the constitution, after enumerating certain specific powers, expressly gives to Congress the power " to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof." If, therefore, the act of Congress establishing the bank was necessary and proper to carry into execution any one or more of the enumerated powers, the authority to pass it is expressly delegated to Congress by the constitution. We contend that it was necessary and proper to carry into execution several of the enumerated powers, such as, the power of levying and collecting taxes throughout this widely extended empire; of paying

the public debts, both in the United States and in foreign countries ; of borrowing money, at home and abroad ; of regulating commerce with foreign nations, and among the several States ; of raising and supporting armies and a navy ; and of carrying on war. That banks, dispersed throughout the country, are appropriate means of carrying into execution all these powers, cannot be denied. Our history furnishes abundant experience of the utility of a national bank as an instrument of finance. It will be. found in the aid derived to the public cause from the Bank of North America, established by Congress, during the war of the revolution ; in the great utility of the former bank of the United States ; and in the necessity of resorting to the instrumentality of the banks incorporated by the States. during the interval between the expiration of the former charter of the United States Bank in 1811, and the establishment of the present bank in 1816 ; a period of war, the calamities of which were greatly aggravated by the want of this convenient instrument of finance. Nor is it required that the power of establishing such a monied corporation should be *indispensably* necessary to the execution of any of the specified powers of the government. An interpretation of this clause of the constitution so strict and literal, would render every law which could be passed by Congress unconstitutional : for of no particular law can it be predicated, that it is absolutely and indispensably necessary to carry into effect any of the specified powers ; since a different law might be imagined, which could be enacted tending to the same. object, though

not equally well adapted to attain it. As the inevitable consequence of giving this very restricted sense to the word " necessary," would be to annihilate the very powers it professes to create; and as so gross an absurdity cannot be imputed to the framers of the constitution, this interpretation must be rejected. Another not less inadmissible consequence of this construction is, that it is fatal to the permanency of the constitutional powers; it makes them dependent for their being on extrinsic circumstances, which, as these are perpetually shifting and changing, must produce correspondent changes in the essence of the powers on which they depend. But surely the constitutionality of any act of Congress cannot depend upon such circumstances. They are the subject of legislative discretion, not of judicial cognizance. Nor does this position conflict with the doctrine of the Court in Sturges v. Crowninshield.[a] The Court has not said, in that case, that the powers of Congress are shifting powers, which may or may not be constitutionally exercised, according to extrinsic or temporary circumstances; but it has merely determined, that the power of the State legislatures over the subject of bankruptcies is subordinate to that of Congress on the same subject, and cannot be exercised so as to conflict with the uniform laws of bankruptcy throughout the Union which Congress may establish. The power, in this instance, resides permanently in Congress, whether it chooses to exercise it or not; but its exercise on the part of the States

a *Ante*, p. 122.

is precarious, and dependent, in certain respects, upon its actual exercise by Congress. The Convention well knew that it was utterly vain and nugatory to give to Congress certain specific powers, without the means of enforcing those powers. The auxiliary means, which are necessary for this purpose, are those which are useful and appropriate to produce the particular end. "Necessary and proper" are, then, equivalent to *needful and adapted.* Such is the popular sense in which the word *necessary* is sometimes used. That use of it is confirmed by the best authorities among lexicographers. Among other definitions of the word "necessary," Johnson gives "needful;" and he defines "need," the root of the latter, by the words "want, occasion." Is a law, then, *wanted,* is there *occasion* for it, in order to carry into execution any of the enumerated powers of the national government; Congress has the power of passing it. To make a law constitutional, nothing more is necessary than that it should be fairly adapted to carry into effect some specific power given to Congress. This is the only interpretation which can give effect to this vital clause of the constitution; and, being consistent with the rules of the language, is not to be rejected because there is another interpretation equally consistent with the same rules, but wholly inadequate to convey what must have been the intention of the Convention. Among the multitude of means to carry into execution the powers expressly given to the national government, Congress is to select, from time to time, such as are most fit for the purpose. It would have been impossible

1819.

M'Culloch
v.
State of Ma-
ryland.

to enumerate them *all* in the constitution; and a specification of some, omitting others, would have been wholly useless. The Court, in inquiring whether Congress has made a selection of constitutional means, is to compare the law in question with the powers it is intended to carry into execution; not in order to ascertain whether other or better means might have been selected, for that is the legislative province, but to see whether those which have been chosen have a natural connection with any specific power; whether they are adapted to give it effect; whether they are appropriate means to an end. It cannot be denied, that this is the character of the Bank of the United States. But it is said, that the government might use private bankers, or the banks incorporated by the States, to carry on their fiscal operations. This, however, presents a mere question of political expediency, which, it is repeated, is exclusively for legislative consideration; which has been determined by the legislative wisdom; and cannot be reviewed by the Court. It is objected, that this act creates a corporation; which, being an exercise of a fundamental power of sovereignty, can only be claimed by Congress, under their grant of specific powers. But to have enumerated the power of establishing corporations among the specific powers of Congress, would have been to change the whole plan of the constitution; to destroy its simplicity, and load it with all the complex details of a code of private jurisprudence. The power of establishing corporations is not one of the *ends* of government; it is only a class of *means* for accomplishing its ends. An enu-

meration of this particular class of means, omitting all others, would have been a useless anomaly in the constitution. It is admitted, that this is an act of sovereignty, and so is any other law. If the authority of establishing corporations be a sovereign power, the United States are sovereign, as to all the powers specifically given to their government, and as to all others necessary and proper to carry into effect those specified. If the power of chartering a corporation be necessary and proper for this purpose, Congress has it to an extent as ample as any other sovereign legislature. Any government of limited sovereignty, can create corporations only with reference to the limited powers that government possesses. The inquiry then reverts, whether the power of incorporating a banking company, be a necessary and proper means of executing the specific powers of the national government. The immense powers incontestably given, show that there was a disposition, on the part of the people, to give ample means to carry those powers into effect. A State can create a corporation, in virtue of its sovereignty, without any specific authority for that purpose, conferred in the State constitutions. The United States are sovereign as to certain specific objects, and may, therefore, erect a corporation for the purpose of effecting those objects. If the incorporating power had been expressly granted as an *end*, it would have conferred a power not intended; if granted as a *means*, it would have conferred nothing more than was before given by necessary implication. Nor does the rule of interpretation we contend for, sanction any usurpation, on the part of the national government; since, if the argument be, that the

implied powers of the constitution may be assumed and exercised, for purposes not really connected with the powers specifically granted, under colour of some imaginary relation between them : the answer is, that this is nothing more than arguing from the abuse of constitutional powers, which would equally apply against the use of those that are confessedly granted to the national government; that the danger of the abuse will be checked by the judicial department, which, by comparing the means with the proposed end, will decide whether the connection is real, or assumed as the pretext for the usurpation of powers not belonging to the government; and that whatever may be the magnitude of the danger from this quarter, it is not equal to that of annihilating the powers of the government, to which the opposite doctrine would inevitably tend.

3. If, then, the establishment of the parent bank itself be constitutional, the right to establish the branches of that bank in the different States of the Union follows, as an incident of the principal power. The expediency of this ramification Congress is alone to determine. To confine the operations of the bank to the District of Columbia, where Congress has the exclusive power of legislation, would be as absurd as to confine the Courts of the United States to this District. Both institutions are wanted, wherever the administration of justice or of the revenue is wanted. The right, then, to establish these branches, is a necessary part of the means. This right is not delegated by Congress to the parent bank. The act of Congress for the establishment of offices of dis-

count and deposit, leaves the time and place of their establishment to the directors, as a matter of detail. When established, they rest, not on the authority of the parent bank, but on the authority of Congress.

4. The only remaining question is, whether the act of the State of Maryland, for taxing the bank thus incorporated, be repugnant to the constitution of the United States? We insist that *any* such tax, by authority of a State, would be unconstitutional, and that this act is so, from its peculiar provisions. But it is objected, that, by the 10th amendment of the constitution, all powers not expressly delegated to the United States, nor prohibited to the States, are reserved to the latter. It is said, that this being neither delegated to the one, nor prohibited to the other, must be reserved: And it is also said, that the only prohibition on the power of State taxation, which does exist, excludes this case, and thereby leaves it to the original power of the States. The only prohibition is, as to laying any imposts, or duties on imports and exports, or tonnage duty, and this not being a tax of that character, is said not to be within the terms of the prohibition; and, consequently, it remains under the authority of the States. But, we answer, that this does not contain the whole sum of constitutional restrictions on the authority of the States. There is another clause in the constitution, which has the effect of a prohibition on the exercise of their authority, in numerous cases. The 6th article of the constitution of the United States, declares, that the laws made in pursuance of it, "shall be the *supreme* law of the land, any thing in the constitution, or laws of

any State to the contrary notwithstanding." By this declaration, the States are prohibited from pass-ing any acts which shall be repugnant to a law of the United States. The Court has already instructed us in the doctrine, that there are certain powers, which, from their nature, are exclusively vested in Congress.[a] So we contend here, that the only ground on which the constitutionality of the bank is main-tainable, excludes all interference with the exercise of the power by the States. This ground is, that the bank, as ordained by Congress, is an instrument to carry into execution its specified powers; and in or-der to enable this instrument to operate effectually, it must be under the direction of a single head. It can-not be interfered with, or controlled in any manner, by the States, without putting at hazard the accom-plishment of the end, of which it is but a means. But the asserted power to tax any of the institutions of the United States, presents directly the question of the supremacy of their laws over the State laws. If this power really exists in the States, its natural and direct tendency is to annihilate any power which be-longs to Congress, whether express or implied. All the powers of the national government are to be exe-cuted in the States, and throughout the States; and if the State legislatures can tax the instruments by which those powers are executed, they may entirely defeat the execution of the powers. If they may tax an institution of finance, they may tax the proceed-ings in the Courts of the United States. If they may

a *Vide* Sturges v. Crowninshield, *ante*, p. 122.

tax to one degree, they may tax to any degree; and nothing but their own discretion can impose a limit upon this exercise of their authority. They may tax both the bank and the Courts, so as to expel them from the States. But, surely, the framers of the constitution did not intend that the exercise of all the powers of the national government should depend upon the discretion of the State governments. This was the vice of the former confederation, which it was the object of the new constitution to eradicate. It is a direct collision of powers between the two governments. Congress says, there shall be a branch of the bank in the State of Maryland. That State says, there shall not. Which power is supreme? Besides, the charter, which is a contract between the United States and the corporation, is violated by this act of Maryland. A new condition is annexed by a sovereignty which was no party to the contract. The franchise, or corporate capacity, is taxed by a legislature, between whom and the object of taxation there is no political connection.

Mr. *Jones*, for the defendants in error, contended, 1. That this was to be considered as an open question, inasmuch as it had never before been submitted to judicial determination. The practice of the government, however inveterate, could never be considered as sanctioning a manifest usurpation; still less could the practice, under a constitution of a date so recent, be put in competition with the cotemporaneous exposition of its illustrious authors, as recorded for our instruction, in the "Letters of Pub-

lius," or *Federalist*. The interpretation of the constitution, which was contended for by the State of Maryland, would be justified from that text book, containing a commentary, such as no other age or nation furnishes, upon its public law.

2. is insisted, that the constitution was formed and adopted, not by the people of the United States at large, but by the people of the respective States. To suppose that the mere proposition of this fundamental law threw the American people into one aggregate mass, would be to assume what the instrument itself does not profess to establish. It is, therefore, a compact between the States, and all the powers which are not expressly relinquished by it, are reserved to the States. We admit, that the 10th amendment to the constitution is merely declaratory ; that it was adopted *ex abundanti cautela ;* and that with it nothing more is reserved than would have been reserved without it. But it is contended, on the other side, that not only the direct powers, but all incidental powers, partake of the supreme power, which is sovereign. This is an inherent sophism in the opposite argument, which depends on the conversion and ambiguity of terms. What is meant by sovereign power ? It is modified by the terms of the grant under which it was given. They do not import sovereign power generally, out sovereign power limited to particular cases ; and the question again recurs, whether sovereign power was given in this particular case. Is it true, that by conferring sovereign powers on a limited, delegated government, sovereign means are also granted ? Is there no re-

striction as to the means of exercising a general power? Sovereignty was vested in the former confederation as fully as in the present national government. There was nothing which forbad the old confederation from taxing the people, except that three modes of raising revenue were pointed out, and they could resort to no other. All the powers given to Congress under that system, except taxation, operated as directly on the people, as the powers given to the present government. The constitution does not profess to prescribe the ends merely for which the government was instituted, but also to detail the most important means by which they were to be accomplished. " To levy and collect taxes," " to borrow money," " to pay the public debts," " to raise and support armies," " to provide and maintain a navy," are not the ends for which this or any other just government is established. If a banking corporation can be said to be involved in either of these means, it must be as an instrument to collect taxes, to borrow money, and to pay the public debts. Is it such an instrument? It may, indeed, facilitate the operation of other financial institutions; but in its proper and natural character, it is a commercial institution, a partnership incorporated for the purpose of carrying on the trade of banking. But we contend that the government of the United States must confine themselves, in the collection and expenditure of revenue, to the means which are specifically enumerated in the constitution, or such auxiliary means as are naturally connected with the specific means. But what natural connection is there be-

tween the collection of taxes, and the incorporation of a company of bankers ? Can it possibly be said, that because Congress is invested with the power of raising and supporting armies, that it may give a charter of monopoly to a trading corporation as a bounty for enlisting men ? Or that, under its more analogous power of regulating commerce, it may establish an East or a West India company, with the exclusive privilege of trading with those parts of the world ? Can it establish a corporation of farmers of the revenue, or burthen the internal industry of the States with vexatious monopolies of their staple productions ? There is an obvious distinction between those means which are incidental to the particular power, which follow as a corollary from it, and those which may be arbitrarily assumed as convenient to the execution of the power, or usurped under the pretext of necessity. For example: the power of coining money implies the power of establishing a mint. The power of laying and collecting taxes implies the power of regulating the mode of assessment and collection, and of appointing revenue officers; but it does not imply the power of establishing a great banking corporation, branching out into every district of the country, and inundating it with a flood of paper money. To derive such a tremendous authority from implication, would be to change the subordinate into fundamental powers ; to make the implied powers greater than those which are expressly granted ; and to change the whole scheme and theory of the government. It is well known, that many of the powers which are ex-

1819.

M'Culloch
v.
State of Maryland.

1819.

M·Culloch
v.
State of Ma-
ryland.

pressly granted to the national government in the consitution, were most reluctantly conceded by the people, who were lulled into confidence by the assurances of its advocates, that it contained no latent ambiguity, but was to be limited to the literal terms of the grant: and in order to quiet all alarm, the 10th article of amendments was added, declaring "that the powers not delegated to the United States by the constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." It would seem that human language could not furnish words less liable to misconstruction! But it is contended, that the powers expressly granted to the national government in the constitution, are enlarged to an indefinite extent, by the sweeping clause, authorizing Congress to make all laws which shall be necessary and proper for carrying into execution the powers expressly delegated to the national government, or any of its departments or officers. Now, we insist, that this clause shows that the intention of the Convention was, to define the powers of the government with the utmost precision and accuracy. The creation of a sovereign legislature implies an authority to pass laws to execute its given powers. This clause is nothing more than a declaration of the authority of Congress *to make laws*, to execute the powers expressly granted to it, and the other departments of the government. But the laws which they are authorized to make, are to be such as are *necessary and proper* for this purpose. No terms could be found in the language more absolutely excluding a general and unlimited discretion than

these. It is not " necessary *or* proper," but " necessary *and* proper." The means used must have both these qualities. It must be, not merely convenient—fit—adapted—proper, to the accomplishment of the end in view ; it must likewise be *necessary* for the accomplishment of that end. Many means may be *proper* which are not *necessary*; because the end may be attained without them. The word "necessary," is said to be a synonyme of " needful." But both these words are defined " indispensably requisite ;" and most certainly this is the sense in which the word " necessary" is used in the constitution. To give it a more lax sense, would be to alter the whole character of the government as a sovereignty of limited powers. This is not a purpose for which violence should be done to the obvious and natural sense of any terms, used in an instrument drawn up with great simplicity, and with extraordinary precision. The only question, then, on this branch of the argument, will be, whether the establishment of a banking corporation *be indispensably requisite* to execute any of the express powers of the government? So far as the interest of the United States is concerned as partners of this company of bankers, or so far as the corporation may be regarded as an executive officer of the government, acquiring real and personal property in trust for the use of the government, it may be asked, what right the United States have to acquire property of any kind, except that purchased by the consent of the legislature of the State in which such property may be, for the erection of forts, magazines, &c.; and ships or muni-

1819.

M‘Culloch
v.
State of Ma-
ryland.

tions of war, constructed or purchased by the Uni-
ted States, and the public treasure? Their right of
acquiring property is absolutely limited to the sub-
jects specified, which were the only means, of the
nature of wealth or property, with which the peo-
ple thought it necessary to invest them. The peo-
ple never intended they should become bankers or,
traders of any description. They meant to leave to
the States the power of regulating the trade of banking,
and every other species of internal industry; subject
merely to the power of Congress to regulate foreign
commerce, and the commerce between the different
States, with which it is not pretended that this as-
serted power is connected. The trade of banking
within the particular States would then either be left
to regulate itself, and carried on as a branch of pri-
vate trade, as it is in many countries; or banking
companies would be incorporated by the State legis-
latures to carry it on, as has been the usage of this
country. But in either case, Congress would have
nothing to do with the subject. The power of cre-
ating corporations is a distinct sovereign power, ap-
plicable to a great variety of objects, and not being
expressly granted to Congress for this, or any other
object, cannot be assumed by implication. If it
might be assumed for this purpose, it might also be
exercised to create corporations for the purpose
of constructing roads and canals; a power to
construct which has been also lately discovered
among other secrets of the constitution, developed
by this dangerous doctrine of implied powers. Or
it might be exercised to establish great trading mo-

nopolies, or to lock up the property of the country in
mortmain, by some strained connection between the
exercise of such powers, and those expressly given
to the government.

1819.

M'Culloch
v.
State of Ma-
ryland.

3. Supposing the establishment of such a bank-
ing corporation, to be implied as one of the means
necessary and proper to execute the powers expressly
granted to the national government, it is contended
by the counsel opposed to us, that its property is ex-
empted from taxation by the State governments, be-
cause they cannot interfere with the exercise of any
of the powers, express or implied, with which Con-
gress is invested. But the radical vice of this argu-
ment is, that the taxing power of the States, as it
would exist, independent of the constitution, is in
no respect limited or controlled by that supreme law,
except in the single case of imposts and tonnage
duties, which the States cannot lay, unless for the
purpose of executing their inspection laws. But
their power of taxation is absolutely unlimited in
every other respect. Their power to tax the pro-
perty of this corporation cannot be denied, without
at the same time denying their right to tax any pro-
perty of the United States. The property of the
bank cannot be more highly privileged than that of
the government. But they are not forbidden from
taxing the property of the government, and therefore
cannot be constructively prohibited from taxing that
of the bank. Being prohibited from taxing exports
and imports, and tonnage, and left free from any other
prohibition, in this respect; they may tax every thing
else but exports, imports, and tonnage. The authority of

"the Federalist" is express, that the taxing power of Congress does not exclude that of the States over any other objects except these. If, then, the exercise of the *taxing power* of Congress does not exclude that of the States, why should the exercise of *any other power* by Congress, exclude the power of taxation by the States? If an express power will not exclude it, shall an implied power have that effect? If a power of the same kind will not exclude it, shall a power of a different kind? The unlimited power of taxation results from State sovereignty. It is expressly taken away only in the particular instances mentioned. Shall others be added by implication? Will it be pretended that there are two species of sovereignty in our government? Sovereign power is absolute, as to the objects to which it may be applied. But the sovereign power of taxation in the States, may be applied to all other objects, except imposts and tonnage: Its exercise cannot, therefore, be limited and controlled by the exercise of another sovereign power in Congress. The right of both sovereignties are co-equal and co-extensive. The trade of banking may be taxed by the State of Maryland; the United States may incorporate a company to carry on the trade of banking, which may establish a branch in Maryland: The exercise of the one sovereign power, cannot be controlled by the exercise of the other. It can no more be controlled in this case, than if it were the power of taxation in Congress, which was interfered with by the power of taxation in the State, both being exerted concurrently on the same object. In both

cases, mutual confidence, discretion, and forbearance, can alone qualify the exercise of the conflicting powers, and prevent the destruction of either. This is an anomaly, and perhaps an imperfection in our system of government. But neither Congress, nor this Court, can correct it. That system was established by reciprocal concessions and compromises between the State and Federal governments. Its harmony can only be maintained in the same spirit. Even admitting that the property of the United States, (such as they have a right to hold,) their forts and dock yards, their ships and military stores, their archives and treasures, public institutions of war, or revenue or justice, are exempt by necessary implication from State taxation; does it therefore follow, that this corporation, which is a partnership of bankers, is also exempt? They are not collectors of the revenue, any more than any State bank or foreign bankers, whose agency the government may find it convenient to employ as depositaries of its funds. They may be employed to remit those funds from one place to another, or to procure loans, or to buy and sell stock: but it is in a commercial, and not an administrative character, that they are thus employed. The corporate character with which these persons are cloathed, does not exempt them from State taxation. It is the nature of their employment as agents or officers of the government, if any thing, which must create the exemption. But the same employment of the State bank or private bankers, would equally entitle them to the same exemption. Nor can the exemption of the stock of this

corporation from State taxation, be claimed on the ground of the proprietary interest which the United States have in it as stockholders. Their interest is undistinguishably blended with the general capital stock; if they will mix their funds with those of bankers, or engage as partners in any other branch of commerce, their sovereign character and dignity are lost in the mercantile character which they have assumed; and their property thus employed becomes subject to local taxation, like other capital employed in trade.

Mr. *Martin*, Attorney General of Maryland, 1. read several extracts from *the Federalist*, and the *debates of the Virginia* and *New-York Conventions*, to show that the cotemporary exposition of the constitution by its authors, and by those who supported its adoption, was wholly repugnant to that now contended for by the counsel for the plaintiff in error. That it was then maintained, by the enemies of the constitution, that it contained a vast variety of powers, lurking under the generality of its phraseology, which would prove highly dangerous to the liberties of the people, and the rights of the States, unless controlled by some declaratory amendment, which should negative their existence. This apprehension was treated as a dream of distempered jealousy. The danger was denied to exist; but to provide an assurance against the possibility of its occurrence, the 10th amendment was added to the constitution. This, however, could be considered as nothing more than declaratory of the sense of the people, as to the extent of the powers

conferred on the new government. We are now
called upon to apply that theory of interpretation
which was then rejected by the friends of the new
constitution, and we are asked to engraft upon it
powers of vast extent, which were disclaimed by
them, and which, if they had been fairly avowed at
the time, would have prevented its adoption. Before
we do this, they must, at least, be proved to exist,
upon a candid examination of this instrument, as if
it were now for the first time submitted to interpre-
pation. Although we cannot, perhaps, be allowed
to say, that the States have been " deceived in their
grant;" yet, we may justly claim something like a
rigorous demonstration of this power, which no
where appears upon the face of the constitution, but
which is supposed to be tacitly inculcated in its ge-
neral object and spirit. That the scheme of the
framers of the constitution intended to leave nothing
to implication, will be evident from the consideration,
that many of the powers expressly given are only
means to accomplish other powers expressly given.
For example : The power to declare war involves,
by necessary implication, if any thing was to be im-
plied, the powers of raising and supporting armies,
and providing and maintaining a navy, to prosecute
the war then declared. So, also, as money is the
sinew of war, the powers of laying and collecting
taxes, and of borrowing money, are involved in that
of declaring war. Yet, all these powers are specifi-
cally enumerated. If, then, the Convention has spe-
cified some powers, which, being only *means* to ac-
complish the *ends* of government, might have been

1819.

M'Culloch
v.
State of Ma-
ryland.

taken by implication ; by what just rule of construction are other sovereign powers, equally vast and important, to be assumed by implication ? We insist, that the only safe rule is the plain letter of the constitution ; the rule which the constitutional legislators themselves have prescribed, in the 10th amendment, which is merely declaratory ; that the powers not delegated to the United States, nor prohibited to the States, are reserved to the States respectively, or to the people. The power of establishing corporations is not delegated to the United States, nor prohibited to the individual States. It is, therefore, reserved to the States, or to the people. It is not expressly delegated, either as an end, or a means of national government. It is not to be taken by implication, as a means of executing any or all of the powers expressly granted ; because other means, not more important or more sovereign in their character, are expressly enumerated. We still insist, that the authority of establishing corporations is one of the great sovereign powers of government. It may well exist in the State governments, without being expressly conferred in the State constitutions ; because those governments have all the usual powers which belong to every political society, unless expressly forbidden, by the letter of the State constitutions, from exercising them. The power of establishing corporations has been constantly exercised by the State governments, and no portion of it has been ceded by them to the government of the United States.

2. But, admitting that Congress has a right to incorporate a banking company, as one of the means

necessary and proper to execute the specific powers
of the national government; we insist, that the re-
spective States have the right to tax the property of
that corporation, within their territory; that the Uni-
ted States cannot, by such an act of incorporation,
withdraw any part of the property within the State
from the grasp of taxation. It is not necessary for
us to contend, that any part of the public property of
the United States, its munitions of war, its ships, and
treasure, are subject to State taxation. But if the
United States hold shares in the stock of a private
banking company, or any other trading company,
their property is not exempt from taxation, in com-
mon with the other capital stock of the company;
still less can it communicate to the shares belonging
to private stockholders, an immunity from local taxa-
tion. The right of taxation by the State, is co-ex-
tensive with all private property within the State.
The interest of the United States in this bank is pri-
vate property, though belonging to public persons
It is held by the government, as an undivided interest
with private stockholders. It is employed in the
same trade, subject to the same fluctuations, of
value, and liable to the same contingencies of pro-
fit and loss. The shares belonging to the United
States, or of any other stockholders, are not sub-
jected to direct taxation by the law of Maryland.
The tax imposed, is a stamp tax upon the notes
issued by a banking house within the State of Ma-
ryland. Because the United States happen to be
partially interested, either as dormant or active part-
ners, in that house, is no reason why the State should
refrain from laying a tax which they have, other-

1819.

M'Culloch
v.
State of Ma-
ryland.

wise, a constitutional right to impose, any more than if they were to become interested in any other house of trade, which should issue its notes, or bills of exchange, liable to a stamp duty, by a law of the State. But it is said that a right to *tax*, in this case, implies a right to *destroy*; that it is impossible to draw the line of discrimination between a tax fairly laid for the purposes of revenue, and one imposed for the purpose of prohibition. We answer, that the same objection would equally apply to the right of Congress to tax the State banks; since the same difficulty of discriminating occurs in the exercise of that right. The whole of this subject of taxation is full of difficulties, which the Convention found it impossible to solve, in a manner entirely satisfactory. The first attempt was to divide the subjects of taxation between the State and the national government. This being found impracticable, or inconvenient, the State governments surrendered altogether their right to tax imports and exports, and tonnage; giving the authority to tax all other subjects to. Congress, but reserving to the States a concurrent right to tax the same subjects to an unlimited extent. This was one of the anomalies of the government, the evils of which must be endured, or mitigated by discretion and mutual forbearance. The debates in the State conventions show that the power of State taxation was understood to be absolutely unlimited, except as to imposts and tonnage duties. The States would not have adopted the constitution upon any other understanding. As to the judicial proceedings, and the custom house papers of the United States, they are

not property, by their very nature; they are not the subjects of taxation; they are the proper instruments of national sovereignty, essential to the exercise of its powers, and in legal contemplation altogether extra-territorial as to State authority.

Mr. *Pinkney*, for the plaintiff in error, in reply, stated, 1. That the cause must first be cleared of a question which ought not to have been forced into the argument—whether the act of Congress establishing the bank was consistent with the constitution? This question depended both on authority and on principle. No topics to illustrate it could be drawn from the confederation, since the present constitution was as different from that, as light from darkness. The former was a-mere federative league; an alliance offensive and defensive between the States, such as there had been many examples of in the history of the world. It had no power of coercion but by arms. Its radical vice, and that which the new constitution was intended to reform, was legislation upon sovereign States in their corporate capacity. But the constitution acts directly *on* the people, by means of powers communicated directly *from* the people. No State, in its corporate capacity, ratified it; but it was proposed for adoption to popular conventions. It springs from the people, precisely as the State constitutions spring from the people, and acts on them in a similar manner. It was adopted by them in the geographical sections into which the country is divided. The federal powers are just as sovereign as these of the States. The State sovereignties are not the authors

of the constitution of the United States. They are preceding in point of time, to the national sovereignty, but they are postponed to it in point of supremacy, by the will of the people. The means of giving efficacy to the sovereign authorities vested by the people in the national government, are those adapted to the end; fitted to promote, and having a natural relation and connexion with, the objects of that government. The constitution, by which these authorities, and the means of executing them, are given, and the laws made in pursuance of it, are declared to be the supreme law of the land; and they would have been such, without the insertion of this declaratory clause. They must be supreme, or they would be nothing. The constitutionality of the establishment of the bank, as one of the means necessary to carry into effect the authorities vested in the national government, is no longer an open question. It has been long since settled by decisions of the most revered authority, legislative, executive, and judicial. A legislative construction, in a doubtful case, persevered in for a course of years, ought to be binding upon the Court. This, however, is not a question of construction merely, but of political necessity, on which Congress must decide. It is conceded, that a manifest usurpation cannot be maintained in this mode; but, we contend, that this is such a doubtful case, that Congress may expound the nature and extent of the authority under which it acts, and that this practical interpretation has become incorporated into the constitution. There are two distinguishing points which entitle it to great respect. The first is, that it was a

cotemporaneous construction; the second is, that it was made by the authors of the constitution themselves. The members of the convention who framed the constitution, passed into the first Congress, by which the new government was organized. They must have understood their own work. They determined that the constitution gave to Congress the power of incorporating a banking company. It was not required that this power should be expressed in the text of the constitution; it might safely be left to implication. An express authority to erect corporations generally, would have been perilous; since it might have been constructively extended to the creation of corporations entirely unnecessary to carry into effect the other powers granted; we do not claim an authority in this respect, beyond the sphere of the specific powers. The grant of an authority to erect certain corporations, might have been equally dangerous, by omitting to provide for others, which time and experience might show to be equally, and even more necessary. It is a historical fact of great importance in this discussion, that amendments to the constitution were actually proposed, in order to guard against the establishment of commercial monopolies. But if the general power of incorporating did not exist, why seek to qualify it, or to guard against its abuse? The legislative precedent established in 1791, has been followed up by a series of acts of Congress, all confirming the authority. Political considerations alone might have produced the refusal to renew the charter in 1811; at any rate, we know that they mingled themselves in the debate, and the determina-

1819.

M'Culloch
v.
State of Maryland.

tion. In 1815, a bill was passed by the two houses of Congress, incorporating a national bank; to which the President refused his assent, upon political considerations only, waiving the question of constitutionality as being settled by cotemporaneous exposition, and repeated subsequent recognitions. In 1816, all branches of the legislature concurred in establishing the corporation, whose chartered rights are now in judgment before the Court. None of these measures ever passed *sub silentio;* the proposed incorporation was always discussed, and opposed, and supported, on constitutional grounds, as well as on considerations of political expediency. Congress is, *prima facie,* a competent judge of its own constitutional powers. It is not, as in questions of privilege, the exclusive judge; but it must first decide, and that in a proper judicial character, whether a law is constitutional, before it is passed. It had an opportunity of exercising its judgment in this respect, upon the present subject, not only in the principal acts incorporating the former, and the present bank, but in the various incidental statutes subsequently enacted on the same subject; in all of which, the question of constitutionality was equally open to debate, but in none of which was it agitated.

There are, then, in the present case, the repeated determinations of the three branches of the national legislature, confirmed by the constant acquiescence of the State sovereignties, and of the people, for a considerable length of time. Their strength is fortified by judicial authority. The decisions in the Courts, affirming the constitutionality of these

laws, passed, indeed, *sub silentio;* but it was the duty of the judges, especially in criminal cases, to have raised the question; and we are to conclude, from this circumstance, that no doubt was entertained respecting it. And if the question be examined on principle, it will be found not to admit of doubt. Has Congress, abstractedly, the authority to erect corporations? This authority is not more a sovereign power than many other powers which are acknowledged to exist, and which are but means to an end. All the objects of the government are national objects, and the means are, and must be, fitted to accomplish them. These objects are enumerated in the constitution, and have no limits but the constitution itself. A more perfect union is to be formed; justice to be established; domestic tranquillity insured; the common defence provided for; the general welfare promoted; the blessings of liberty secured to the present generation, and to posterity. For the attainment of these vast objects, the government is armed with powers and faculties corresponding in magnitude. Congress has power to lay and collect taxes and duties, imposts and excises; to pay the debts, and provide for the common defence and general welfare of the United States; to borrow money on the credit of the nation; to regulate commerce; to establish uniform naturalization and bankrupt laws; to coin money, and regulate the circulating medium, and the standard of weights and measures; to establish post offices and post roads; to promote the progress of science and the useful arts, by granting patents and copy-rights; to constitute tribunals inferior to the Supreme Court, and to de-

fine and punish offences against the law of nations; to declare and carry on war; to raise and support armies, and to provide and maintain a navy; to discipline and govern the land and naval forces; to call forth the militia to execute the laws, suppress insurrections, and repel invasions; to provide for organizing, arming, and disciplining the militia; to exercise exclusive legislation, in all cases, over the district where the seat of government is established, and over such other portions of territory as may be ceded to the Union for the erection of forts, magazines, &c.; to dispose of, and make all needful rules and regulations respecting the territory or other property belonging to the United States; and to make all laws which shall be necessary and proper for carrying into execution these powers and all other powers vested in the national government or any of its departments or officers. The laws thus made are declared to be the supreme law of the land; and the judges in every State are bound thereby, any thing in the constitution or laws of any State to the contrary notwithstanding. Yet it is doubted, whether a government invested with such immense powers has authority to erect a corporation within the sphere of its general objects, and in order to accomplish some of those objects? The State powers are much less in point of magnitude, though greater in number; yet it is supposed the States possess the authority of establishing corporations, whilst it is denied to the general government. It is conceded to the State legislatures, though not specifically granted, because it is said to be an incident of State sovereignty; but it

is refused to Congress, because it is not specifically granted, though it may be necessary and proper to execute the powers which are specifically granted. But the authority of legislation in the State government is not unlimited.   There are several limitations to their legislative authority.   First; from the nature of all government, especially of republican government, in which the residuary powers of sovereignty, not granted specifically, by inevitable implication, are reserved to the people.   Secondly; from the express limitations contained in the State constitutions. And, Thirdly; from the express prohibitions to the States contained in the United States' constitution. The power of erecting corporations is no where expressly granted to the legislatures of the States in their constitutions; it is taken by necessary implication: but it cannot be exercised to accomplish any of the ends which are beyond the sphere of their constitutional authority.   The power of erecting corporations is not an end of any government; it is a necessary means of accomplishing the ends of all governments.   It is an authority inherent in, and incident to, all sovereignty.   The history of corporations will illustrate this position.   They were transplanted from the Roman law into the common law of England, and all the municipal codes of modern Europe.   From England they were derived to this country.   But, in the civil law, a corporation could be created by a mere voluntary association of individuals.[a]   And, in England, the authority of parlia-

---

*a* 1. Bl. Com. 471.

ment is not necessary to create a corporate body. The king may do it, and may communicate his power to a subject;[a] so little is this regarded as a transcendent power of sovereignty in the British constitution. So, also, in our constitution it ought to be regarded as but a subordinate power, to carry into effect the great objects of government. The State governments cannot establish corporations to carry into effect the national powers given to Congress, nor can Congress create corporations to execute the peculiar duties of the State governments. But so much of the power or faculty of incorporation as concerns national objects has passed away from the State legislatures, and is vested in the national government. An act of incorporation is but a law, and laws are but means to promote the legitimate end of all government—the felicity of the people. All powers are given to the national government, as the people will. The reservation in the 10th amendment to the constitution, of "powers not delegated to the United States," is not confined to powers not *expressly* delegated. Such an amendment was indeed proposed; but it was perceived, that it would strip the government of some of its most essential powers, and it was rejected. Unless a specific means be expressly prohibited to the general government, it has it, within the sphere of its specified powers. Many particular means are, of course, involved in the general means necessary to carry into effect the powers expressly granted, and, in that case, the general means become

*a* 1 *Bl. Com.* 474.

the end, and the smaller objects the means. It was impossible for the framers of the constitution to specify prospectively all these means, both because it would have involved an immense variety of details, and because it would have been impossible for them to foresee the infinite variety of circumstances in such an unexampled state of political society as ours, forever changing and forever improving. How unwise would it have been to legislate immutably for exigencies which had not then occurred, and which must have been foreseen but dimly and imperfectly! The security against abuse is to be found in the constitution and nature of the government, in its popular character and structure. The statute book of the United States is filled with powers derived from implication. The power to lay and collect taxes will not execute itself. Congress must designate in detail all the means of collection. So, also, the power of establishing post offices and post roads, involves that of punishing the offence of robbing the mail. But there is no more necessary connexion between the punishment of mail robbers, and the power to establish post roads, than there is between the institution of a bank, and the collection of the revenue and payment of the public debts and expenses. So, light houses, beacons, buoys, and public piers, have all been established under the general power to regulate commerce. But they are not indispensably necessary to commerce. It might linger on without these aids, though exposed to more perils and losses. So, Congress has authority to coin money, and to guard the purity of the circulating medium, by providing for the punish-

ment of *counterfeiting* the current coin: but laws are also made for punishing the offence of *uttering and passing* the coin thus counterfeited. It is the duty of the Court to construe the constitutional powers of the national government liberally, and to mould them so as to effectuate its great objects. Whence is derived the power to punish smuggling? It does not collect the impost, but it is a means more effectually to prevent the collection from being diminished in amount, by frauds upon the revenue laws. Powers, as means, may then be implied in many cases. And if so, why not in this case as well as any other? The power of making all needful rules and regulations respecting the territory of the United States, is one of the specified powers of Congress. Under this power, it has never been doubted, that Congress had authority to establish corporations in the territorial governments. But this power is derived entirely from implication. It is assumed as an incident to the principal power. If it may be assumed in that case, upon the ground that it is a necessary means of carrying into effect the power expressly granted, why may it not be assumed in the present case, upon a similar ground? It is readily admitted, that there must be a relation in the nature and fitness of things, between the means used and the end to be accomplished. But the question is, whether the necessity which will justify a resort to a certain means must be an absolute, indispensable, inevitable necessity? The power of passing all laws necessary and proper to carry into effect the other powers specifically granted, is a political power; it

1819.

M'Culloch
v.
State of Ma-
ryland.

is a matter of legislative discretion, and those who exercise it, have a wide range of choice in selecting means. In its exercise, the mind must compare means with each other. But absolute necessity excludes all choice; and therefore, it cannot be this species of necessity which is required. Congress alone has the fit means of inquiry and decision. The more or less of necessity never can enter as an ingredient into judicial decision. Even *absolute* necessity cannot be judged of here; still less can practical necessity be determined in a judicial forum. The judiciary may, indeed, and must, see that what has been done is not a mere evasive pretext, under which the national legislature travels out of the prescribed bounds of its authority, and encroaches upon State sovereignty, or the rights of the people. For this purpose, it must inquire whether the means assumed have a connexion, in the nature and fitness of things, with the end to be accomplished. The vast variety of possible means, excludes the practicability of judicial determination as to the fitness of a particular means. It is sufficient that it does not appear to be violently and unnaturally forced into the service, or fraudulently assumed, in order to usurp a new substantive power of sovereignty. A philological analysis of the terms "necessary and proper" will illustrate the argument. Compare these terms as they are used in that part of the constitution now in question, with the qualified manner in which they are used in the 10th section of the same article. In the latter, it is provided that "no State shall, without the consent of Congress, lay any imposts or duties, on im-

ports or exports, except what may be *absolutely ne-cessary* for executing its inspection laws." In the clause in question, Congress is invested with the power "to make all laws which shall be *necessary and proper* for carrying into execution the foregoing powers," &c. There is here then, no qualification of the necessity. It need not be absolute. It may be taken in its ordinary grammatical sense. The word *necessary*, standing by itself, has no inflexible meaning; it is used in a sense more or less strict, according to the subject. This, like many other words, has a primitive sense, and another figurative and more relaxed; it may be qualified by the addition of adverbs of diminution or enlargement, such as very, indispensably, more, less, or absolutely necessary; which last is the sense in which it is used in the 10th section of this article of the constitution. But that it is not always used in this strict and rigorous sense, may be proved by tracing its definition and etymology in every human language.

If, then, all the powers of the national government are sovereign and supreme; if the power of incorporation is incidental, and involved in the others; if the degree of political necessity which will justify a resort to a particular means, to carry into execution the other powers of the government, can never be a criterion of judicial determination, but must be left to legislative discretion; it only remains to inquire, whether a bank has a natural and obvious connection with other express or implied powers, so as to become a necessary and proper means of carrying them into execution. A bank

might be established as a branch of the public administration without incorporation. The government might issue paper upon the credit of the public faith, pledged for its redemption, or upon the credit of its property and funds. Let the office where this paper is issued be made a place of deposit for the money of individuals, and authorize its officers to discount, and a bank is created. It only wants the forms of incorporation. But, surely, it will not be pretended, that clothing it with these forms would make such an establishment unconstitutional. In the bank which is actually established and incorporated, the United States are joint stockholders, and appoint joint directors ; the secretary of the treasury has a supervising authority over its affairs ; it is bound, upon his requisition, to transfer the funds of the government wherever they may be wanted ; it performs all the duties of commissioners of the loan office ; it is bound to loan the government a certain amount of money on demand ; its notes are receivable in payment for public debts and duties ; it is intimately connected, according to the usage of the whole world, with the power of borrowing money, and with all the financial operations of the government. It has, also, a close connection with the power of regulating foreign commerce, and that between the different States. It provides a circulating medium, by which that commerce can be more conveniently carried on, and exchanges may be facilitated. It is true, there are State banks by which a circulating medium to a certain extent is provided. But that only diminishes the quantum of necessity,

which is no criterion by which to test the constitutionality of a measure. It is also connected with the power of making all needful regulations for the government of the territory, " and *other property* of the United States." If they may establish a corporation to regulate their territory, they may establish one to regulate their property. Their treasure is their property, and may be invested in this mode. It is put in partnership; but not for the purpose of carrying on the trade of banking, as one of the ends for which the government was established; but only as an instrument or means for executing its sovereign powers. This instrument could not be rendered effectual for this purpose but by mixing the property of individuals with that of the public. The bank could not otherwise acquire a credit for its notes. Universal experience shows, that, if altogether a government bank, it could not acquire, or would soon lose, the confidence of the community.

2. As to the branches, they are identical with the parent bank. The power to establish them is that species of subordinate power, wrapped up in the principal power, which Congress may place at its discretion.

3. The last, and greatest, and only difficult question in the cause, is that which respects the assumed right of the States to tax this bank, and its branches, thus established by Congress? This is a question, comparatively of no importance to the individual States, but of vital importance to the Union. Deny this exemption to the bank as an instrument of government, and what is the consequence? There is no express provi-

1819.

M'Culloch
v.
State of Ma-
ryland.

sion in the constitution, which exempts any of the national institutions or property from State taxation. It is only by implication that the army, and navy, and treasure, and judicature of the Union are exempt from State taxation. Yet they are practically exempt; and they must be, or it would be in the power of any one State to destroy their use. Whatever the United States have a right to do, the individual States have no right to undo. The power of Congress to establish a bank, like its other sovereign powers, is supreme, or it would be nothing. Rising out of an exertion of paramount authority, it cannot be subject to any other power. Such a power in the States, as that contended for on the other side, is manifestly repugnant to the power of Congress; since a power to establish implies a power to continue and preserve. There is a manifest repugnancy between the power of Maryland to tax, and the power of Congress to preserve, this institution. A power to build up what another may pull down at pleasure, is a power which may provoke a smile, but can do nothing else. This law of Maryland acts directly on the operations of the bank, and *may* destroy it. There is no limit or check in this respect, but in the discretion of the State legislature. That discretion cannot be controlled by the national councils. Whenever the local councils of Maryland will it, the bank *must* be expelled from that State. A right to tax without limit or control, is essentially a power to destroy. If one national institution may be destroyed in this manner, all may be destroyed in the same manner. If this power to tax the national property and institutions

1819.

M'Culloch
v.
State of Ma-
ryland.

exists in the State of Maryland, it is unbounded in extent. There can be no check upon it, either by Congress, or the people of the other States. Is there then any intelligible, fixed, defined boundary of this taxing power? If any, it must be found in this Court. If it does not exist here, it is a nonentity. But the Court cannot say what is an abuse, and what is a legitimate use of the power. The legislative intention may be so masked, as to defy the scrutinizing eye of the Court. How will the Court ascertain, *a priori*, that a given amount of tax will crush the bank? It is essentially a question of political economy, and there are always a vast variety of facts bearing upon it. The facts may be mistaken. Some important considerations belonging to the subject may be kept out of sight. They must all vary with times and circumstances. The result, then, must determine whether the tax is destructive. But the bank may linger on for some time, and that result cannot be known until the work of destruction is consummated. A criterion which has been proposed, is to see whether the tax has been laid, impartially, upon the State banks, as well as the Bank of the United States. Even this is an unsafe test; for the State governments may, wish, and intend, to destroy their own banks. The existence of any national institution ought not to depend upon so frail a security. But this tax is levelled exclusively at the branch of the United States' Bank established in Maryland. There is, in point of fact, a branch of no other bank within that State, and there can legally be no other. It is a fundamental article of the State

constitution of Maryland, that taxes shall operate on all the citizens impartially, and uniformly, in proportion to their property, with the exception, however, of taxes laid *for political purposes.* This is a tax laid for a political purpose; for the purpose of destroying a great institution of the national government; and if it were not imposed for that purpose, it would be repugnant to the State constitution, as not being laid uniformly on all the citizens, in proportion to their property. So that the legislature cannot disavow this to be its object, without, at the same time, confessing a manifest violation of the State constitution. Compare this act of Maryland with that of Kentucky, which is yet to come before the Court, and the absolute necessity of repressing such attempts in their infancy, will be evident. Admit the constitutionality of the Maryland tax, and that of Kentucky follows inevitably. How can it be said, that the office of discount and deposit in Kentucky cannot bear a tax of sixty thousand dollars per annum, payable monthly? *Probably* it could not; but judicial *certainty* is essential; and the Court has no means of arriving at that certainty. There is then, here, an absolute repugnancy of power to power; we are not bound to show, that the particular exercise of the power in the present case is absolutely repugnant. It is sufficient that the same power may be thus exercised.

There certainly may be some exceptions out of the taxing power of the States, other than those created by the taxing power of Congress; because, if there were no implied exceptions, then the navy, and other

1819.

M'Culloch
v.
State of Maryland.

1819.

M'Culloch
v.
State of Ma-
ryland.

exclusive property of the United States, would be
liable to State taxation. If some of the powers of
Congress, other than its taxing power, necessarily
involve incompatibility with the taxing power of the
States, this *may be* incompatible. This *is* incompa-
ble; for a power to impose a tax *ad libitum* upon the
notes of the bank, is a power to repeal the law, by
which the bank was created. The bank cannot be
useful, it cannot act at all, unless it issues notes. If
the present tax does not disable the bank from issuing
its notes, another may; and it is the authority itself
which is questioned as being entirely repugnant to the
power which established, and preserves the bank.
Two powers thus hostile and incompatible cannot
co-exist. There must be, in this case, an implied
exception to the general taxing power of the States,
because it is a tax upon the legislative faculty of
Congress, upon the national property, upon the na-
tional institutions. Because the taxing powers of
the two governments are concurrent in some respects,
it does not follow, that there may not be limitations
on the taxing power of the States, other than those
which are imposed by the taxing power of Congress.
Judicial proceedings are practically a subject of tax-
ation in many countries, and in some of the States
of this Union. The States are not expressly prohi-
bited in the constitution from taxing the judicial pro-
ceedings of the United States. Yet such a prohibi-
tion must be implied, or the administration of justice
in the national Courts might be obstructed by a prohi-
bitory tax. But such a tax is no more a tax on the
legislative faculty of Congress than this. The branch

1819.

M'Culloch
v.
State of Ma-
ryland.

bank in Maryland is as much an institution of the sovereign power of the Union, as the Circuit Court of Maryland. One is established in virtue of an express power; the other by an implied authority; but both are equal, and equally supreme. All the property and all the institutions of the United States are, constructively, without the local, territorial jurisdiction of the individual States, in every respect, and for every purpose, including that of taxation. This immunity must extend to this case, because the power of taxation imports the power of taxation for the purpose of prohibition and destruction. The immunity of foreign public vessels from the local jurisdiction, whether State or national, was established in the case of the Exchange,[a] not upon positive municipal law, nor upon conventional law; but it was implied, from the usage of nations, and the necessity of the case. If, in favour of foreign governments, such an edifice of exemption has been built up, independent of the letter of the constitution, or of any other written law, shall not a similar edifice be raised on the same foundations, for the security of our own national government? So, also, the jurisdiction of a foreign power, holding a temporary possession of a portion of national territory, is no where provided for in the constitution; but is derived from inevitable implication.[b] These analogies show, that there may be exemptions from State jurisdiction, not detailed in the constitution, but arising out of general considerations. If Congress has power to do a particular act,

a 7 *Cranch*, 116.    b The United States v. Rice, *ante, p.* 246.

no State can impede, retard, or burthen it. Can there be a stronger ground, to infer a cessation of State jurisdiction?

The bank of the United States is as much an instrument of the government for fiscal purposes, as the Courts are its instruments for judicial purposes. They both proceed from the supreme power, and equally claim its protection. Though every State in the Union may impose a stamp tax, yet no State can lay a stamp tax upon the judicial proceedings or custom-house papers of the United States. But there is no such express exception to the general taxing power of the States contained in the constitution. It arises from the general nature of the government, and from the principle of the supremacy of the national powers, and the laws made to execute them, over the State authorities and State laws.

It is objected, however, that the act of Congress, incorporating the bank, withdraws property from taxation by the State, which would be otherwise liable to State taxation. We answer, that it is immaterial, if it does thus withdraw certain property from the grasp of State taxation, if Congress had authority to establish the bank, since the power of Congress is supreme. But, in fact, it withdraws nothing from the mass of taxable property in Maryland, which that State could tax. The whole capital of the bank belonging to private stockholders, is drawn from every State in the Union, and the stock belonging to the United States, previously constituted a part of the public treasure. Neither the stock belonging to citizens of other States, nor the privileged treasure

of the United States mixed up with this private pro-perty, were previously liable to taxation in Mary-land; and as to the stock belonging to its own citi-zens, it still continues liable to State taxation, as a portion of their individual property, in common with all the other private property in the State. The establish-ment of the bank, so far from withdrawing any thing from taxation by the State, brings something into Maryland which that State may tax. It produces re-venue to the citizens of Maryland, which may be tax-ed equally and uniformly, with all their other private property. The materials of which the ships of war, belonging to the United States, are constructed, were previously liable to State taxation. But the instant they are converted into public property, for the public defence, they cease to be subject to State tax-ation. So here the treasure of the United States, and that of individuals, citizens of Maryland, and of other States, are undistinguishably confounded in the capital stock of this great national institution, which, it has been before shown, could be made use-ful as an instrument of finance, in no other mode than by thus blending together the property of the government and of private merchants. This partner-ship is, therefore, one of necessity, on the part of the United States. Either this tax operates upon the franchise of the bank, or upon its property. If upon the former, then it comes directly in conflict with the exercise of a great sovereign authority of Congress; if upon the latter, then it is a tax upon the property of the United States; since the law does not, and

cannot, in imposing a stamp tax, distinguish their in-terest from that of private stockholders.

But it is said, that · Congress possesses and exer-cises the unlimited authority of taxing the State banks ; and, therefore, the States ought to have an equal right to tax the bank of the United States. The answer to this objection is, that, in taxing the State banks, the States in Congress exercise their power of taxation.  Congress exercises the power of the people.  The whole acts on the whole.  But the State tax is a part acting on the whole.  Even if the two cases were the same, it would rather ex-empt the State banks from federal taxation, than sub-ject the bank of the United States to taxation by a particular State.   But the State banks are not ma-chines essential to execute the powers of the State sovereignties, and, therefore, this is out of the ques-tion.  The people of the United States, and the so-vereignties of the several States, have no control over the taxing power of a particular State.  But they have a control over the taxing power of the United States, in the responsibility of the members of the House of Representatives to the people of the State which sends them, and of the senators to the legis-lature by whom they are chosen.  But there is no correspondent responsibility of the local legislature of Maryland, for example, to the people of the other States of the Union.  The people of other States are not represented in the legislature of Maryland, and can have no control, directly or, indirectly, over its proceedings.  The legislature of Maryland is respon-sible only to the people of that State.  The nation-

1819.

M‘Culloch
v.
State of Ma-
ryland.

al government can withdraw nothing from the tax-ing power of the States, which is not for the purpose of national benefit and the common welfare, and within its defined powers.  But the local interests of the States are in perpetual conflict with the interests of the Union; which shows the danger of adding power to the partial views and local prejudices of the States.  If the tax imposed by this law be not a tax on the property of the United States, it is not a tax on any property; and it must, consequently, be a tax on the faculty, or franchise.  It is, then, a tax on the legislative faculty of the Union, on the charter of the bank.  It imposes a stamp duty upon the notes of the bank, and thus stops the very source of its circulation and life.  It is as much a direct interference with the legislative faculty of Congress, as would be a tax on patents, or copy rights, or custom-house papers, or judicial proceedings.

Since, then, the constitutional government of this republican empire cannot be practically enforced, so as to secure the permanent glory, safety, and felicity of this great country, but by a fair and liberal interpretation of its powers; since those powers could not all be expressed in the constitution, but many of them must be taken by implication; since the sovereign powers of the Union are supreme, and, wherever they come in direct conflict and repugnancy with those of the State governments, the latter must give way; since it has been proved that this is the case as to the institution of the bank, and the general power of taxation by the States; since this power, unlimited and unchecked, as it necessarily must be, by the

very nature of the subject, is absolutely inconsistent with, and repugnant to, the right of the United States to establish a national bank; if the power of taxation be applied to the corporate property, or franchise, or property of the bank, and might be applied in the same manner, to destroy any other of the great institutions and establishments of the Union, and the whole machine of the national government might be arrested in its motions, by the exertion, in other cases, of the same power which is here attempted to be exerted upon the bank : no other alternative remains, but for this Court to interpose its authority, and save the nation from the consequences of this dangerous attempt.

*March 7th.*     Mr. Chief Justice MARSHALL delivered the opinion of the Court.

In the case now to be determined, the defendant, a sovereign State, denies the obligation of a law enacted by the legislature of the Union, and the plaintiff, on his part, contests the validity of an act which has been passed by the legislature of that State. The constitution of our country, in its most interesting and vital parts, is to be considered ; the conflicting powers of the government of the Union and of its members, as marked in that constitution, are to be discussed ; and an opinion given, which may essentially influence the great operations of the government. No tribunal can approach such a question without a deep sense of its importance, and of the awful responsibility involved in its decision. But it must be decided peacefully, or remain a source of

hostile legislation, perhaps of hostility of a still more serious nature; and if it is to be so decided, by this tribunal alone can the decision be made. On the Supreme Court of the United States has the constitution of our country devolved this important duty.

1819.

M'Culloch
v.
State of Maryland.

The first question made in the cause is, has Congress power to incorporate a bank?

It has been truly said, that this can scarcely be considered as an open question, entirely unprejudiced by the former proceedings of the nation respecting it. The principle now contested was introduced at a very early period of our history, has been recognised by many successive legislatures, and has been acted upon by the judicial department, in cases of peculiar delicacy, as a law of undoubted obligation.

It will not be denied, that a bold and daring usurpation might be resisted, after an acquiescence still longer and more complete than this. But it is conceived that a doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice. An exposition of the constitution, deliberately established by legislative acts, on the faith of which an immense property has been advanced, ought not to be lightly disregarded.

The power now contested was exercised by the first Congress elected under the present constitution.

The bill for incorporating the bank of the United States did not steal upon an unsuspecting legislature, and pass unobserved. Its principle was completely understood, and was opposed with equal zeal and ability. After being resisted, first in the fair and open field of debate, and afterwards in the executive cabinet, with as much persevering talent as any measure has ever experienced, and being supported by arguments which convinced minds as pure and as intelligent as this country can boast, it became a law. The original act was permitted to expire; but a short experience of the embarrassments to which the refusal to revive it exposed the government, convinced those who were most prejudiced against the measure of its necessity, and induced the passage of the present law. It would require no ordinary share of intrepidity to assert that a measure adopted under these circumstances was a bold and plain usurpation, to which the constitution gave no countenance.

These observations belong to the cause; but they are not made under the impression that, were the question entirely new, the law would be found irreconcilable with the constitution.

In discussing this question, the counsel for the State of Maryland have deemed it of some importance, in the construction of the constitution, to consider that instrument not as emanating from the people, but as the act of sovereign and independent States. The powers of the general government, it has been said, are delegated by the States, who alone are truly sovereign; and must be exercised in subordination to the States, who alone possess supreme dominion.

It would be difficult to sustain this proposition. The Convention which framed the constitution was indeed elected by the State legislatures. But the instrument, when it came from their hands, was a mere proposal, without obligation, or pretensions to it. It was reported to the then existing Congress of the United States, with a request that it might " be submitted to a Convention of Delegates, chosen in each State by the people thereof, under the recommendation of its Legislature, for their assent and ratification." This mode of proceeding was adopted; and by the Convention, by Congress, and by the State Legislatures, the instrument was submitted to the people. They acted upon it in the only manner in which they can act safely, effectively, and wisely, on such a subject, by assembling in Convention. It is true, they assembled in their several States—and where else should they have assembled ? No political dreamer was ever wild enough to think of breaking down the lines which separate the States, and of compounding the American people into one common mass. Of consequence, when they act, they act in their States. But the measures they adopt do not, on that account, cease to be the measures of the people themselves, or become the measures of the State governments.

From these Conventions the constitution derives its whole authority. The government proceeds directly from the people ; is " ordained and established " in the name of the people ; and is declared to be ordained, " in order to form a more perfect union, establish justice, ensure domestic tranquillity, and secure

the blessings of liberty to themselves and to their posterity." The assent of the States, in their sovereign capacity, is implied in calling a Convention, and thus submitting that instrument to the people. But the people were at perfect liberty to accept or reject it; and their act was final. It required not the affirmance, and could not be negatived, by the State governments. The constitution, when thus adopted, was of complete obligation, and bound the State sovereignties.

It has been said, that the people had already surrendered all their powers to the State sovereignties, and had nothing more to give. But, surely, the question whether they may resume and modify the powers granted to government does not remain to be settled in this country. Much more might the legitimacy of the general government be doubted, had it been created by the States. The powers delegated to the State sovereignties were to be exercised by themselves, not by a distinct and independent sovereignty, created by themselves. To the formation of a league, such as was the confederation, the State sovereignties were certainly competent. But when, "in order to form a more perfect union," it was deemed necessary to change this alliance into an effective government, possessing great and sovereign powers, and acting directly on the people, the necessity of referring it to the people, and of deriving its powers directly from them, was felt and acknowledged by all.

The government of the Union, then, (whatever may be the influence of this fact on the case,) is,

emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit.

This government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it, would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge. That principle is now universally admitted. But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, as long as our system shall exist.

In discussing these questions, the conflicting powers of the general and State governments must be brought into view, and the supremacy of their respective laws, when they are in opposition, must be settled.

If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result necessarily from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one State may be willing to control its operations, no State is willing to allow others to control them. The nation, on those subjects on which it can act, must necessarily bind its component parts. But this question is not left to mere reason: the people have, in express terms, decided it, by say-

ing, " this constitution, and the laws of the United States, which shall be made in pursuance thereof," " shall be the supreme law of the land," and by requiring that the members of the State legislatures, and the officers of the executive and judicial departments of the States, shall take the oath of fidelity to it.

The government of the United States, then, though limited in its powers, is supreme ; and its laws, when made in pursuance of the constitution, form the supreme law of the land, " any thing in the constitution or laws of any State to the contrary notwithstanding."

Among the enumerated powers, we do not find that of establishing a bank or creating a corporation. But there is no phrase in the instrument which, like the articles of confederation, excludes incidental or implied powers ; and which requires that every thing granted shall be expressly and minutely described. Even the 10th amendment, which was framed for the purpose of quieting the excessive jealousies which had been excited, omits the word " expressly," and declares only that the powers " not delegated to the United States, nor prohibited to the States, are reserved to the States or to the people ;" thus leaving the question, whether the particular power which may become the subject of contest has been delegated to the one government, or prohibited to the other, to depend on a fair construction of the whole instrument. The men who drew and adopted this amendment had experienced the embarrassments resulting from the insertion of this word in the articles

of confederation, and probably omitted it to avoid those embarrassments. A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind. It would probably never be understood by the public. Its nature, therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves. That this idea was entertained by the framers of the American constitution, is not only to be inferred from the nature of the instrument, but from the language. Why else were some of the limitations, found in the ninth section of the 1st article, introduced? It is also, in some degree, warranted by their having omitted to use any restrictive term which might prevent its receiving a fair and just interpretation. In considering this question, then, we must never forget, that it is *a constitution* we are expounding.

Although, among the enumerated powers of government, we do not find the word "bank" or "incorporation," we find the great powers to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies. The sword and the purse, all the external relations, and no inconsiderable portion of the industry of the nation, are entrusted to its government. It can never be pretended

1819.

M·Culloch
v.
State of Maryland.

1819.

M'Culloch
v.
State of Ma-
ryland.

that these vast powers draw after them others of inferior importance, merely because they are inferior. Such an idea can never be advanced. But it may with great reason be contended, that a government, entrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be entrusted with ample means for their execution. The power being given, it is the interest of the nation to facilitate its execution. It can never be their interest, and cannot be presumed to have been their intention, to clog and embarrass its execution by withholding the most appropriate means. Throughout this vast republic, from the St. Croix to the Gulph of Mexico, from the Atlantic to the Pacific, revenue is to be collected and expended, armies are to be marched and supported. The exigencies of the nation may require that the treasure raised in the north should be transported to the south, *that* raised in the east conveyed to the west, or that this order should be reversed. Is that construction of the constitution to be preferred which would render these operations difficult, hazardous, and expensive? Can we adopt that construction, (unless the words imperiously require it,) which would impute to the framers of that instrument, when granting these powers for the public good, the intention of impeding their exercise by withholding a choice of means? If, indeed, such be the mandate of the constitution, we have only to obey; but that instrument does not profess to enumerate the means by which the powers it confers may be executed; nor does it prohibit the creation of a corpo-

ration, if the existence of such a being be essential to the beneficial exercise of those powers. It is, then, the subject of fair inquiry, how far such means may be employed.

1819.

M'Culloch
v.
State of Ma-
ryland.

It is not denied, that the powers given to the government imply the ordinary means of execution. That, for example, of raising revenue, and applying it to national purposes, is admitted to imply the power of conveying money from place to place, as the exigencies of the nation may require, and of employing the usual means of conveyance. But it is denied that the government has its choice of means; or, that it may employ the most convenient means, if, to employ them, it be necessary to erect a corporation.

On what foundation does this argument rest? On this alone: The power of creating a corporation, is one appertaining to sovereignty, and is not expressly conferred on Congress. This is true. But all legislative powers appertain to sovereignty. The original power of giving the law on any subject whatever, is a sovereign power; and if the government of the Union is restrained from creating a corporation, as a means for performing its functions, on the single reason that the creation of a corporation is an act of sovereignty; if the sufficiency of this reason be acknowledged, there would be some difficulty in sustaining the authority of Congress to pass other laws for the accomplishment of the same objects.

The government which has a right to do an act, and has imposed on it the duty of performing that act, must, according to the dictates of reason, be al-

lowed to select the means ; and those who contend that it may not select any appropriate means, that one particular mode of effecting the object is excepted, take upon themselves the burden of establishing that exception.

The creation of a corporation, it is said, appertains to sovereignty. This is admitted. But to what portion of sovereignty does it appertain ? Does it belong to one more than to another ? In America, the powers of sovereignty are divided between the government of the Union, and those of the States. They are each sovereign, with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other. We cannot comprehend that train of reasoning which would maintain, that the extent of power granted by the people is to be ascertained, not by the nature and terms of the grant, but by its date. Some State constitutions were formed *before*, some *since* that of the United States. We cannot believe that their relation to each other is in any degree dependent upon this circumstance. Their respective powers must, we think, be precisely the same as if they had been formed at the same time. Had they been formed at the same time, and had the people conferred on the general government the power contained in the constitution, and on the States the whole residuum of power, would it have been asserted that the government of the Union was not sovereign with respect to those objects which were entrusted to it, in relation to which its laws were declared to be supreme ? If this could not have been asserted, we cannot well comprehend the process of reasoning

1819.

M'Culloch
v.
State of Ma-
ryland.

which maintains, that a power appertaining to sovereignty cannot be connected with that vast portion of it which is granted to the general government, so far as it is calculated to subserve the legitimate objects of that government.   The power of creating a corporation, though appertaining to sovereignty, is not, like the power of making war, or levying taxes, or of regulating commerce, a great substantive and independent power, which cannot be implied as incidental to other powers, or used as a means of executing them.   It is never the end for which other powers are exercised, but a means by which other objects are accomplished.   No contributions are made to charity for the sake of an incorporation, but a corporation is created to administer the charity ; no seminary of learning is instituted in order to be incorporated, but the corporate character is conferred to subserve the purposes of education.   No city was ever built with the sole object of being incorporated, but is incorporated as affording the best means of being well governed.   The power of creating a corporation is never used for its own sake, but for the purpose of effecting something else. . No sufficient reason is, therefore, perceived, why it may not pass as incidental to those powers which are expressly given, if it be a direct mode of executing them.

But the constitution of the United States has not left the right of Congress to employ the necessary means, for the execution of the powers conferred on the government, to general reasoning.   To its enumeration of powers is added that of making " all

laws which shall be necessary and proper, for carrying into execution the foregoing powers, and all other powers vested by this constitution, in the government of the United States, or in any department thereof."

The counsel for the State of Maryland have urged various arguments, to prove that this clause, though in terms a grant of power, is not so in effect; but is really restrictive of the general right, which might otherwise be implied, of selecting means for executing the enumerated powers.

In support of this proposition, they have found it necessary to contend, that this clause was inserted for the purpose of conferring on Congress the power of making laws. That, without it, doubts might be entertained, whether Congress could exercise its powers in the form of legislation.

But could this be the object for which it was inserted? A government is created by the people, having legislative, executive, and judicial powers. Its legislative powers are vested in a Congress, which is to consist of a Senate and House of Representatives. Each house may determine the rule of its proceedings; and it is declared that every bill which shall have passed both houses, shall, before it becomes a law, be presented to the President of the United States. The 7th section describes the course of proceedings, by which a bill shall become a law; and, then, the 8th section enumerates the powers of Congress. Could it be necessary to say, that a legislature should exercise legislative powers, in the shape of legislation? After allowing each house to pre-

scribe its own course of proceeding, after describing the manner in which a bill should become a law, would it have entered into the mind of a single member of the Convention, that an express power to make laws was necessary to enable the legislature to make them? That a legislature, endowed with legislative powers, can legislate, is a proposition too self-evident to have been questioned.

, But the argument on which most reliance is placed, is drawn from the peculiar language of this clause. Congress is not empowered by it to make all laws, which may have relation to the powers conferred on the government, but such only as may be "*necessary and proper*" for carrying them into execution. The word " *necessary*," is considered as controlling the whole sentence, and as li  .ing the right to pass laws for the execution of the granted powers, to such as are indispensable, and without which the power would be nugatory. , That it excludes the choice of. means, and leaves to Congress, in each case, that only which is most direct and simple.

Is it true, that this is the sense in which the word " necessary" is always used ? .Does it always import an absolute physical necessity, so strong, that one thing, to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to

produce the end, and not as being confined to those single- means, without which the end would be entirely unattainable. Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea; and nothing is more common than to use words in a figurative sense. Almost all compositions contain words, which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense—in that sense which common usage justifies. The word " necessary" is of this description. It has not a fixed character peculiar to itself. It admits of all degrees of comparison; and is often connected with other words, which increase or diminish the impression the mind receives of the urgency it imports. A thing may be necessary, very necessary, absolutely or indispensably necessary. To no mind would the same idea be conveyed, by these several phrases. This comment on the word is well illustrated, by the passage cited at the bar, from the 10th section of the 1st article of the constitution. It is, we think, impossible to compare the sentence which prohibits a State from laying " imposts, or duties on imports or exports, except what may be *absolutely* necessary for executing its inspection laws," with that which authorizes Congress " to make all laws which shall be necessary and proper for carrying into execution" the powers of the general government, without feeling a conviction that the convention understood itself to change ma-

terially the meaning of the word " necessary," by prefixing the word " absolutely." This word, then, like others, is used in various senses; and, in its construction, the subject, the context, the intention of the person using them, are all to be taken into view.

Let this be done in the case under consideration. The subject is the execution of those great powers on which the welfare of a nation essentially depends. It must have been the intention of those who gave these powers, to insure, as far as human prudence could insure, their beneficial execution. This could not be done by confiding the choice of means to such narrow limits as not to leave it in the power of Congress to adopt any which might be appropriate, and which were conducive to the end. This provision is made in a constitution intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs. To have prescribed the means by which government should, in all future time, execute its powers, would have been to change, entirely, the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur. To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circum-

stances. If we apply this principle of construction to any of the powers of the government, we shall find it so pernicious in its operation that we shall be compelled to discard it. The powers vested in Congress may certainly be carried into execution, without prescribing an oath of office. The power to exact this security for the faithful performance of duty, is not given, nor is it indispensably necessary. The different departments may be established; taxes may be imposed and collected; armies and navies may be raised and maintained; and money may be borrowed, without requiring an oath of office. It might be argued, with as much plausibility as other incidental powers have been assailed, that the Convention was not unmindful of this subject. The oath which might be exacted—that of fidelity to the constitution—is prescribed, and no other can be required. Yet, he would be charged with insanity who should contend, that the legislature might not superadd, to the oath directed by the constitution, such other oath of office as its wisdom might suggest.

So, with respect to the whole penal code of the United States: whence arises the power to punish in cases not prescribed by the constitution? All admit that the government may, legitimately, punish any violation of its laws; and yet, this is not among the enumerated powers of Congress. The right to enforce the observance of law, by punishing its infraction, might be denied with the more plausibility, because it is expressly given in some cases. Congress is empowered "to provide for the punishment

of counterfeiting the securities and current coin of the United States," and " to define and punish piracies and felonies committed on the high seas, and offences against the law of nations." The several powers of Congress may exist, in a very imperfect state to be sure, but they may exist and be carried into execution, although no punishment should be inflicted in cases where the right to punish is not expressly given.

Take, for example, the power " to establish post offices and post roads." This power is executed by the single act of making the establishment. But, from this has been inferred the power and duty of carrying the mail along the post road, from one post office to another. And, from this implied power, has again been inferred the right to punish those who steal letters from the post office, or rob the mail. It may be said, with some plausibility, that the right to carry the mail, and to punish those who rob it, is not indispensably necessary to the establishment of a post office and post road. This right is indeed essential to the beneficial exercise of the power, but not indispensably necessary to its existence. So, of the punishment of the crimes of stealing or falsifying a record or process of a Court of the United States, or of perjury in such Court. To punish these offences is certainly conducive to the due administration of justice. But courts may exist, and may decide the causes brought before them, though such crimes escape punishment.

The baneful influence of this narrow construction on all the operations of the government, and the ab-

1819.

M‘Culloch
v.
State of Ma-
ryland.

solute impracticability of maintaining it without ren-dering the government incompetent to its great ob-jects, might be illustrated by numerous examples drawn from the constitution, and from our laws. The good sense of the public has pronounced, without hesitation, that the power of punishment appertains to sovereignty, and may be exercised whenever the sovereign has a right to act, as incidental to his constitutional powers. It is a means for carrying into execution all sovereign powers, and may be used, although not indispensably necessary. It is a right incidental to the power, and conducive to its beneficial exercise.

If this limited construction of the word "necessary" must be abandoned in order to punish, whence is derived the rule which would reinstate it, when the government would carry its powers into execution by means not vindictive in their nature? If the word "necessary" means " needful," " requisite," " essential," " conducive to," in order to let in the power of punishment for the infraction of law ; why is it not equally comprehensive when required to authorize the use of means which facilitate the execution of the powers of government without the infliction of punishment?"

In ascertaining the sense in which the word " necessary" is used in this clause of the constitution, we may derive some aid from that with which it is associated. Congress shall have power " to make all laws which shall be necessary and *proper* to carry into execution" the powers of the government. If the word " necessary" was used in that strict and rigorous sense for which the counsel for the State of

1819.

M'Culloch
v.
State of Ma-
ryland.

Maryland contend, it would be an extraordinary departure from the usual course of the human mind, as exhibited in composition, to add a word, the only possible effect of which is to qualify that strict and rigorous meaning; to present to the mind the idea of some choice. of means of legislation not straitened and compressed within the narrow limits for which gentlemen contend.

But the argument which most conclusively demonstrates the error of the construction contended for by the counsel for the State of Maryland, is founded on the intention of the Convention, as manifested in the whole clause. To waste time and argument in proving that, without it, Congress might carry its powers into execution, would be not much less idle than to hold a lighted taper to the sun. As little can it be required to prove, that in the absence of this clause, Congress would have some choice of means. That it might employ those which, in its judgment, would most advantageously effect the object to be accomplished. That any means adapted to the end, any means which tended directly to the execution of the constitutional powers of the government, were in themselves constitutional. This clause, as construed by the State of Maryland, would abridge, and almost annihilate this useful and necessary right of the legislature to select its means. That this could not be intended, is, we should think, had it not been already controverted, too apparent for controversy. We think so for the following reasons :

Ist. The clause is placed among the powers of Congress, not among the limitations on those powers.

2nd. Its terms purport to enlarge, not to diminish the powers vested in the government. It purports to be an additional power, not a restriction on those already granted. No reason has been, or can be assigned for thus concealing an intention to narrow the discretion of the national legislature under words which purport to enlarge it. The framers of the constitution wished its adoption, and well knew that it would be endangered by its strength, not by its weakness. Had they been capable of using language which would convey to the eye one idea, and, after deep reflection, impress on the mind another, they would rather have disguised the grant of power, than its limitation. If, then, their intention had been, by this clause, to restrain the free use of means which might otherwise have been implied, that intention would have been inserted in another place, and would have been expressed in terms resembling these. " In carrying into execution the foregoing powers, and all others," &c. " no laws shall be passed but such as are necessary and proper." Had the intention been to make this clause restrictive, it would unquestionably have been so in form as well as in effect.

The result of the most careful and attentive consideration bestowed upon this clause is, that if it does not enlarge, it cannot be construed to restrain the powers of Congress, or to impair the right of the legislature to exercise its best judgment in the selection of measures to carry into execution the constitutional powers of the government. If no other motive for its insertion can be suggested, a sufficient one is found in the desire to remove all doubts respecting

the right to legislate on that vast mass of incidental powers which must be involved in the constitution, if that instrument be not a splendid bauble.

We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

That a corporation must be considered as a means not less usual, not of higher dignity, not more requiring a particular specification than other means, has been sufficiently proved. If we look to the origin of corporations, to the manner in which they have been framed in that government from which we have derived most of our legal principles, and ideas, or to the uses to which they have been applied, we find no reason to suppose that a constitution, omitting, and wisely omitting, to enumerate all the means for carrying into execution the great powers vested in government, ought to have specified this. Had it been intended to grant this power as one which should be distinct and independent, to be exercised in any case whatever, it

would have found a place among the enumerated powers of the government. But being considered merely as a means, to be employed only for the purpose of carrying into execution the given powers, there could be no motive for particularly mentioning it.

The propriety of this remark would seem to be generally acknowledged by the universal acquiescence in the construction which has been uniformly put on the 3rd section of the 4th article of the constitution. The power to "make all needful rules and regulations respecting the territory or other property belonging to the United States," is not more comprehensive, than the power "to make all laws which shall be necessary and proper for carrying into execution" the powers of the government. Yet all admit the constitutionality of a territorial government, which is a corporate body.

If a corporation may be employed indiscriminately with other means to carry into execution the powers of the government, no particular reason can be assigned for excluding the use of a bank, if required for its fiscal operations. To use one, must be within the discretion of Congress, if it be an appropriate mode of executing the powers of government. That it is a convenient, a useful, and essential instrument in the prosecution of its fiscal operations, is not now a subject of controversy. All those who have been concerned in the administration of our finances, have concurred in representing its importance and necessity; and so strongly have they been felt, that statesmen of the first class, whose previous opinions

against it had been confirmed by every circumstance which can fix the human judgment, have yielded those opinions to the exigencies of the nation. Under the confederation, Congress, justifying the measure by its necessity, transcended perhaps its powers to obtain the advantage of a bank; and our own legislation attests the universal conviction of the utility of this measure. The time has passed away when it can be necessary to enter into any discussion in order to prove the importance of this instrument, as a means to effect the legitimate objects of the government.

But, were its necessity less apparent, none can deny its being an appropriate measure; and if it is, the degree of its necessity, as has been very justly observed, is to be discussed in another place. Should Congress, in the execution of its powers, adopt measures which are prohibited by the constitution; or should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government; it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land. But where the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court disclaims all pretensions to such a power.

1819.

M'Culloch
v.
State of Maryland.

After this declaration, it can scarcely be necessary to say, that the existence of State banks can have no possible influence on the question. No trace is to be found in the constitution of an intention to create a dependence of the government of the Union on those of the States, for the execution of the great powers assigned to it. Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishment of its ends. To impose on it the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution. But were it otherwise, the choice of means implies a right to choose a national bank in preference to State banks, and Congress alone can make the election.

After the most deliberate consideration, it is the unanimous and decided opinion of this Court, that the act to incorporate the Bank of the United States is a law made in pursuance of the constitution, and is a part of the supreme law of the land.

The branches, proceeding from the same stock, and being conducive to the complete accomplishment of the object, are equally constitutional. It would have been unwise to locate them in the charter, and it would be unnecessarily inconvenient to employ the legislative power in making those subordinate arrangements. The great duties of the bank are prescribed; those duties require branches; and the bank itself

may, we think, be safely trusted with the selection of places where those branches shall be fixed; reserving always to the government the right to require that a branch shall be located where it may be deemed necessary.

It being the opinion of the Court, that the act incorporating the bank is constitutional; and that the power of establishing a branch in the State of Maryland might be properly exercised by the bank itself, we proceed to inquire—

2. Whether the State of Maryland may, without violating the constitution, tax that branch?

That the power of taxation is one of vital importance; that it is retained by the States; that it is not abridged by the grant of a similar power to the government of the Union; that it is to be concurrently exercised by the two governments: are truths which have never been denied. But, such is the paramount character of the constitution, that its capacity to withdraw any subject from the action of even this power, is admitted. The States are expressly forbidden to lay any duties on imports or exports, except what may be absolutely necessary for executing their inspection laws. If the obligation of this prohibition must be conceded—if it may restrain a State from the exercise of its taxing power on imports and exports; the same paramount character would seem to restrain, as it certainly may restrain, a State from such other exercise of this power, as is in its nature incompatible with, and repugnant to, the constitutional laws of the Union. A law, absolutely repugnant to another, as entirely

repeals that other as if express terms of repeal were used.

On this ground the counsel for the bank place its claim to be exempted from the power of a State to tax its operations. There is no express provision for the case, but the claim has been sustained on a principle which so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it, without rending it into shreds.

This great principle is, that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them. From this, which may be almost termed an axiom, other propositions are deduced as corollaries, on the truth or error of which, and on their application to this case, the cause has been supposed to depend. These are, 1st. that a power to create implies a power to preserve. 2nd. That a power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and to preserve. 3d. That where this repugnancy exists, that authority which is supreme must control, not yield to that over which it is supreme.

These propositions, as abstract truths, would, perhaps, never be controverted. Their application to this case, however, has been denied; and, both in maintaining the affirmative and the negative, a splendor of eloquence, and strength of argument, seldom, if ever, surpassed, have been displayed.

1819.

M‘Culloch
v.
State of Ma-
ryland.

The power of Congress to create, and of course to continue, the bank, was the subject of the preceding part of this opinion; and is no longer to be considered as questionable.

That the power of taxing it by the States may be exercised so as to destroy it, is too obvious to be denied. But taxation is said to be an absolute power, which acknowledges no other limits than those expressly prescribed in the constitution, and like sovereign power of every other description, is trusted to the discretion of those who use it. But the very terms of this argument admit that the sovereignty of the State, in the article of taxation itself, is subordinate to, and may be controlled by the constitution of the United States. How far it has been controlled by that instrument must be a question of construction. In making this construction, no principle not declared, can be admissable, which would defeat the legitimate operations of a supreme government. It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence. This effect need not be stated in terms. It is so involved in the declaration of supremacy, so necessarily implied in it, that the expression of it could not make it more certain. We must, therefore, keep it in view while construing the constitution.

The argument on the part of the State of Maryland, is, not that the States may directly resist a law of Congress, but that they may exercise their

acknowledged powers upon it, and that the consti-
tution leaves them this right in the confidence that
they will not abuse it.

Before we proceed to examine this argument, and
to subject it to the test of the constitution, we must
be permitted to bestow a few considerations on the
nature and extent of this original right of taxation,
which is acknowledged to remain with the States.
It is admitted that the power of taxing the people
and their property is essential to the very existence
of government, and may be legitimately exercised
on the objects to which it is applicable, to the utmost
extent to which the government may chuse to carry
it.   The only security against the abuse of this
power, is found in the structure of the government
itself.   In imposing a tax the legislature acts upon
its constituents.   This is in general a sufficient se-
curity against erroneous and oppressive taxation.

The people of a State, therefore, give to their go-
vernment a right of taxing themselves and their pro-
perty, and as the exigencies of government cannot
be limited, they prescribe no limits to the exercise of
this right, resting confidently on the interest of the
legislator, and on the influence of the constituents
over their representative, to guard them against its
abuse.   But the means employed by the government
of the Union have no such security, nor is the right
of a State to tax them sustained by the same theory.
Those means are not given by the people of a par-
ticular State, not given by the constituents of the le-
gislature, which claim the right to tax them, but by
the people of all the States.   They are given by all,

for the benefit of all—and upon theory, should be subjected to that government only which belongs to all.

It may be objected to this definition, that the power of taxation is not confined to the people and property of a State. It may be exercised upon every object brought within its jurisdiction.

This is true. But to what source do we trace this right? It is obvious, that it is an incident of sovereignty, and is co-extensive with that to which it is an incident. All subjects over which the sovereign power of a State extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation. This proposition may almost be pronounced self-evident.

The sovereignty of a State extends to every thing which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States? We think it demonstrable that it does not. Those powers are not given by the people of a single State. They are given by the people of the United States, to a government whose laws, made in pursuance of the constitution, are declared to be supreme. Consequently, the people of a single State cannot confer a sovereignty which will extend over them.

If we measure the power of taxation residing in a State, by the extent of sovereignty which the people of a single State possess, and can confer on its government, we have an intelligible standard, appli-

cable to every case to which the power may be ap-
plied. We have a principle which leaves the power
of taxing the people and property of a State unim-
paired; which leaves to a State the command of all
its resources, and which places beyond its reach, all
those powers which are conferred by the people of
the United States on the government of the Union,
and all those means which are given for the purpose
of carrying those powers into execution. We have
a principle which is safe for the States, and safe for
the Union. We are relieved, as we ought to be,
from clashing sovereignty; from interfering powers;
from a repugnancy between a right in one government
to pull down what there is an acknowledged right in
another to build up; from the incompatibility of a
right in one government to destroy what there is a
right in another to preserve. We are not driven to
the perplexing inquiry, so unfit for the judicial de-
partment, what degree of taxation is the legitimate
use, and what degree may amount to the abuse of
the power. The attempt to use it on the means em-
ployed by the government of the Union, in pursu-
ance of the constitution, is itself an abuse, because it
is the usurpation of a power which the people of a
single State cannot give.

We find, then, on just theory, a total failure of this
original right to tax the means employed by the go-
vernment of the Union, for the execution of its pow-
ers. The right never existed, and the question whe-
ther it has been surrendered, cannot arise.

But, waiving this theory for the present, let us re-
sume the inquiry, whether this power can be exercised

by the respective States, consistently with a fair con-
struction of the constitution?

That the power to tax involves the power to de-
stroy; that the power to destroy may defeat and ren-
der useless the power to create; that there is a plain
repugnance, in conferring on one government a pow-
er to control the constitutional measures of another,
which other, with respect to those very measures, is
declared to be supreme over that which exerts the
control, are propositions not to be denied.    But all
inconsistencies are to be reconciled by the magic of
the word CONFIDENCE.    Taxation, it is said, does
not necessarily and unavoidably destroy.    To carry it
to the excess of destruction would be an abuse, to pre-
sume which, would banish that confidence which is
essential to all government.

But is this a case of confidence?  Would the
people of any one State trust those of another
with a power to control the most insignificant
operations of their State government? We know
they would not.    Why, then, should we suppose
that the people of any one State should be wil-
ling to trust those of another with a power to control
the operations of a government to which they have
confided their most important and most valuable in-
terests? In the legislature of the Union alone, are all
represented.    The legislature of the Union alone,
therefore, can be trusted by the people with the pow-
er of controlling measures which concern all, in the
confidence that it will not be abused.    This, then, is
not a case of confidence, and we must consider it as
it really is.

1819.

M'Culloch
v.
State of Ma-
ryland.

If we apply the principle for which the State of Maryland contends, to the constitution generally, we shall find it capable of changing totally the character of that instrument. We shall find it capable of arresting all the measures of the government, and of prostrating it at the foot of the States. The American people have declared their constitution, and the laws made in pursuance thereof, to be supreme ; but this principle would transfer the supremacy, in fact, to the States.

If the States may tax one instrument, employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail ; they may tax the mint ; they may tax patent rights ; they may tax the papers of the custom-house ; they may tax judicial process ; they may tax all the means employed by the government, to an excess which would defeat all the ends of government. This was not intended by the American people. They did not design to make their government dependent on the States.

Gentlemen say, they do not claim the right to extend State taxation to these objects. They limit their pretensions to property. But on what principle is this distinction made ? Those who make it have furnished no reason for it, and the principle for which they contend denies it. They contend that the power of taxation has no other limit than is found in the 10th section of the 1st article of the constitution ; that, with respect to every thing else, the power of the States is supreme, and admits of no control. If this be true, the distinction between property and

other subjects to which the power of taxation is applicable, is merely arbitrary, and can never be sustained. This is not all. If the controling power of the States be established; if their supremacy as to taxation be acknowledged; what is to restrain their exercising this control in any shape they may please to give it? Their sovereignty is not confined to taxation. That is not the only mode in which it might be displayed. The question is, in truth, a question of supremacy; and if the right of the States to tax the means employed by the general government be conceded, the declaration that the constitution, and the laws made in pursuance thereof, shall be the supreme law of the land, is empty and unmeaning declamation.

In the course of the argument, the *Federalist* has been quoted; and the opinions expressed by the authors of that work have been justly supposed to be entitled to great respect in expounding the constitution. No tribute can be paid to them which exceeds their merit; but in applying their opinions to the cases which may arise in the progress of our government, a right to judge of their correctness must be retained; and, to understand the argument, we must examine the proposition it maintains, and the objections against which it is directed. The subject of those numbers, from which passages have been cited, is the unlimited power of taxation which is vested in the general government. The objection to this unlimited power, which the argument seeks to remove, is stated with fullness and clearness. It is, " that an indefinite power of taxation in the latter (the go-

vernment of the Union) might, and probably would, in time, deprive the former (the government of the States) of the means of providing for their own necessities; and would subject them entirely to the mercy of the national legislature. As the laws of the Union are to become the supreme law of the land; as it is to have power to pass all laws that may be necessary for carrying into execution the authorities with which it is proposed to vest it; the national government might at any time abolish the taxes imposed for State objects, upon the pretence of an interference with its own. It might allege a necessity for doing this, in order to give efficacy to the national revenues; and thus all the resources of taxation might, by degrees, become the subjects of federal monopoly, to the entire exclusion and destruction of the State governments."

The objections to the constitution which are noticed in these numbers, were to the undefined power of the government to tax, not to the incidental privilege of exempting its own measures from State taxation. The consequences apprehended from this undefined power were, that it would absorb all the objects of taxation, " to the exclusion and destruction of the State governments." The arguments of the *Federalist* are intended to prove the fallacy of these apprehensions; not to prove that the government was incapable of executing any of its powers, without exposing the means it employed to the embarrassments of State taxation. Arguments urged against these objections, and these apprehensions, are to be understood as relating to the points they

mean to prove. Had the authors of those excel-
lent essays been asked, whether they contended
for that construction of the constitution, which
would place within the reach of the States those
measures which the government might adopt for
the execution of its powers; no man, who has
read their instructive pages, will hesitate to admit,
that their answer must have been in the negative.

It has also been insisted, that, as the power of tax-
ation in the general and State governments is ac-
knowledged to be concurrent, every argument which
would sustain the right of the general government
to tax banks chartered by the States, will equally sus-
tain the right of the States to tax banks chartered
by the general government.

But the two cases are not on the same reason.
The people of all the States have created the gene-
ral government, and have conferred upon it the ge-
neral power of taxation. The people of all the
States, and the States themselves, are represented in
Congress, and, by their representatives, exercise this
power. When they tax the chartered institutions of
the States, they tax their constituents; and these
taxes must be uniform. But, when a State taxes
the operations of the government of the United
States, it acts upon institutions created, not by their
own constituents, but by people over whom they
claim no control. It acts upon the measures of a
government created by others as well as themselves,
for the benefit of others in common with themselves.
The difference is that which always exists, and always
must exist, between the action of the whole on a

part, and the action of a part on the whole—between the laws of a government declared to be supreme, and those of a government which, when in opposition to those laws, is not supreme.

But if the full application of this argument could be admitted, it might bring into question the right of Congress to tax the State banks, and could not prove the right of the States to tax the Bank of the United States.

The Court has bestowed on this subject its most deliberate consideration. The result is a conviction that the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

We are unanimously of opinion, that the law passed by the legislature of Maryland, imposing a tax on the Bank of the United States, is unconstitutional and void.

This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State. But this is a tax on the operations of the bank, and is, consequently, a tax on the operation of an instrument employed by the go-

vernment of the Union to carry its powers into execution. Such a tax must be unconstitutional.

JUDGMENT. This cause came on to be heard on the transcript of the record of the Court of Appeals of the State of Maryland, and was argued by counsel. On consideration whereof, it is the opinion of this Court, that the Act of the Legislature of Maryland is contrary to the Constitution of the United States, and void; and, therefore, that the said Court of Appeals of the State of Maryland erred in affirming the judgment of the Baltimore County Court, in which judgment was rendered against James W. M'Culloch; but that the said Court of Appeals of Maryland ought to have reversed the said judgment of the said Baltimore County Court, and ought to have given judgment for the said appellant, M'Culloch. It is, therefore, Adjudged and Ordered, that the said judgment of the said Court of Appeals of the State of Maryland in this case, be, and the same hereby is, reversed and annulled. And this Court, proceeding to render such judgment as the said Court of Appeals should have rendered; it is further Adjudged and Ordered, that the judgment of the said Baltimore County Court be reversed and annulled, and that judgment be entered in the said Baltimore County Court for the said James W. M'Culloch.